No. 41,323

Sinclair Pipe Line Company, a Corporation, *Appellant*, v. State Commission of Revenue and Taxation, Roy N. McCue, Ira C. Watson and John L. MacNair as Members of and Composing Said Commission; The Board of County Commissioners of the County of Montgomery; The City of Independence, Kansas; The Board of Education of the City of Independence of the State of Kansas; Also Known as School District No. 5 of Montgomery County, Kansas; Guy Sherman (Substituted Defendant), County Treasurer of Montgomery County, Kansas; and Eldon Sloan, State Director of Property Valuation (Substituted Defendant), *Appellees.*

(339 P. 2d 341)

Opinion filed May 16, 1959.

*Harold Medill* and *William Gough, Jr.,* both of Independence, argued the cause, and were on the briefs for the appellant.

*John F. O'Brien,* of Independence, and *Peter F. Caldwell,* of Topeka, argued the cause, and *John P. Quinlan* and *Tom Crossan,* both of Independence, and *Glen Tongier,* of Coffeyville, were with them on the briefs for the appellees.

The opinion of the court was delivered by

JACKSON, J.: This action was begun by the appellant, a Delaware corporation, to recover taxes paid under protest and assessed pursuant to G. S. 1949, 79-701 *et seq.* upon certain corporate stock owned by appellant. The case was tried to the court, which made extensive findings of fact, and held that the intangible tax under G. S. 1949, 79-3108 *et seq.* was validly assessed upon appellant's property. Appellant has appealed from that decision.

This is the second appeal in this case. In the former appeal, in *Sinclair Pipe Line Co. v. State Commission of Revenue & Taxation,* 181 Kan. 310, 311 P. 2d 342, it was held that the venue of the action was correct; that the state of Kansas was immune from suit and should be dismissed as a party defendant, and that the plaintiff's petition was sufficient as against a demurrer. Any further information concerning the former appeal is readily available in the opinion of the court in the former appeal.

However, before leaving the former appeal one contention of the plaintiff concerning the former decision may be answered. In several places in the present record and briefs, which together amount to some eight hundred pages, plaintiff contends that the former opinion is in some manner determinative of its rights on this appeal, and that the trial court therefore erred in its decision. It would appear that such contention is untenable. A short answer is that the former demurrer admitted the facts alleged in the petition, while the trial court's present decision is based upon the facts shown at the trial of the case. There may be other reasons why plaintiff's contention is not valid, but the foregoing will suffice.

In the caption of this appeal, it will be noted that there have been certain substitutions among the appellees who were defendants below. The reasons therefor are readily apparent, are immaterial to the questions now before the court, and need not be set out. The parties for the sake of brevity will be referred to as plaintiff and defendants.

As already noted, the district court at the close of the trial made extensive findings of fact. These findings are of importance and are set out, or in some instances summarized, in an appendix which follows this opinion.

In a general way, it may be said that the trial court concluded that plaintiff carried on its business from its home office in Kansas and in effect operated pipe lines in three different ways for the

transportation of petroleum and petroleum products. Plaintiff has wholly owned pipe lines, pipe lines which it operates in conjunction with other pipe line companies in a rather unusual co-operative manner called undivided interest lines, and also holds stock in corporations which own pipe lines. The other stockholders in these corporations are other oil pipe line companies. It is this stock in the jointly owned pipe line companies which is the basis of the present action. The court found the stock company lines had a definite part in plaintiff's over-all business and had a taxable situs at plaintiff's home office in Kansas.

Based upon these findings the trial court made the following conclusions of law:

"CONCLUSIONS OF LAW

"1. The headquarters, principal place of business, corporate seat of government, and the commercial domicile of Sinclair Pipe Line Company at all times pertinent hereto was Independence, Kansas.

"2. The Court concludes that the ownership of the various shares of stock involved in this action formed an integral part of plaintiff's business.

"3. The Court therefore concludes that such shares of stock had a tax situs within the State of Kansas, and that the decision of the State Commission of Revenue and Taxation, subjecting the ownership of such shares of stock to the Kansas intangible tax was lawful and proper.

· "4. The Court, therefore, concludes that judgment should be entered in favor of the defendants and against the plaintiff herein, and that plaintiff should be adjudged to pay the costs of the action."

It would seem the ultimate question to be decided upon this appeal is whether the findings of the trial court support the conclusions of law made.

Plaintiff objects at considerable length to many of the findings of the trial court, but when these objections are refined, it seems that at least one of the chief complaints is that defendants were allowed to use the annual reports of the Sinclair Oil Corporation, the parent holding company of the plaintiff, made under the signature of the president of the parent company, to cross-examine the executive officers of the plaintiff, and that these reports were admitted as exhibits. The facts about these reports are set forth in Finding 14 (appendix), and see also Findings 12 and 13. It is noted that plaintiff issues no published annual reports to stockholders, all of its stock being held by Sinclair Oil Corporation, but that the parent corporation regularly reports to its stockholders as to the condition of its subsidiaries including plaintiff. It will also be noted in the brief that the only actual objection urged against

the use of these exhibits is that it was improper cross-examination.
It does not appear in the record that this line of questioning was
not proper cross-examination. The trial court did at one point
suggest that perhaps defendants wished to make the witness their
own. Perhaps, in effect, this was done. At any rate, the exhibits
themselves were in the end introduced into evidence without further
objection. It would seem the objection of the plaintiff really in its
most favorable light comes down to a mere objection as to the order
of proof, which is a matter of the discretion of the trial court, see
*Cunningham v. Cunningham*, 178 Kan. 97, at p. 103, 283 P. 2d
405, and cases cited. It seems clear that there was no reversible
error on the part of the trial court in considering the annual reports
of the Sinclair Oil Corporation, and in allowing the use of such
reports in cross-examination of plaintiff's executives.

Another objection is that the trial court excluded as irrelevant the
offer of reports made to the Interstate Commerce Commission and
tax returns made by plaintiff for income tax purposes. Plaintiff's
brief has failed to show that this exclusion constituted error since
none of the reports are shown to have had bearing on the tax situs
of the corporate stock involved in this action.

Running through all of plaintiff's objections, we feel it unneces-
sary to take any other objection up particularly, is a claim that the
trial court erred in disregarding the corporate entities of the various
corporations involved. It would almost appear that plaintiff is not
really disputing any of the facts—all of the facts were shown by the
testimony of its own officers and the reports issued as to plaintiff's
condition by its parent corporation—plaintiff is only saying the
court should have taken a narrower view of the picture. But it can
hardly be maintained that the court was actually disregarding the
corporate entity of the members of the Sinclair family when it
merely took into account their relation to each other in the family
(see Findings 12, 13, 14, 15, 16 and 20).

Returning to the corporate reports, in plaintiff's reply brief is
found rather an unusual statement relating to these reports, which
included a map (plaintiff's Exhibit "G") showing the wholly owned
pipe lines, the "undivided interest lines" and the pipe lines in which
plaintiff has an interest through ownership of the stock involved in
this action. As to this, the reply brief states:

"The only use defendants have shown plaintiff has made of stock company
lines is that plaintiff draws them on a map for publicity purposes the same as

undivided interest lines. Can this be a use of a pipeline facility? We think not.

"Use, not a publicity gimmick, is what counts."

The only actual error in the findings of fact is that by inadvertence the trial court stated in Finding 11, see appendix, that plaintiff had paid without protest the taxes assessed by the state of Kansas on these stocks during the years "*1951* to 1954" inclusive. There is no argument about the matter, the year 1951 is perhaps a typographical error, the plaintiff did not own the stocks in 1951 and did not pay taxes thereon for that year. Likewise there is no dispute that plaintiff did pay the taxes for 1952, 1953 and 1954 without making any protest or complaint.

We now return to the conclusions of law made by the trial court which have been set out, *supra*. As to conclusion No. 1, relating to the fact that plaintiff's commercial domicile is in Independence, Kansas, we fail to find any dissent upon the part of the plaintiff (see Findings 18 and 19). The only objection seems to be that the business and taxable situs of the stocks are not in Kansas—this will be discussed later—and that the only state having jurisdiction to tax the stock would be the state of Delaware, the state of plaintiff's origin.

The theory of a corporation's commercial domicile has not been before this court in prior cases and the concept merits some consideration. The matter of a commercial domicile of a corporation and the power to tax has been considered by the Supreme Court of the United States in several cases. In *Wheeling Steel Corp. v. Fox*, 298 U. S. 193, 80 L. Ed. 1143, 56 S. Ct. 773, the court in considering a case concerning the taxation of intangible property said in part:

"*Second.*—The Corporation complied with the laws of the State of its creation in designating its 'principal' office in that State. It is manifest that this designation, while presumably sufficient for the purpose, was a technical one and that the office is not a principal office so far as the actual conduct of business is concerned. While a duplicate stock ledger and records of transactions with respect to capital stock are maintained in Delaware, the business operations of the Corporation are conducted outside that State. The office in Delaware is maintained through the service of an agency organized to furnish this convenience to corporations of that description. To attribute to Delaware, merely as the chartering State, the credits arising in the course of the business established in another State, and to deny to the latter the power to tax such credits upon the ground that it violates due process to treat the credits as within its jurisdiction, is to make a legal fiction dominate realities in a fashion quite as extreme as that which would attribute to the chartering State all the tangible possessions of the Corporation without regard to their actual location."

"The constitutional authority of West Virginia to tax the accounts receivable and bank deposits in question cannot be denied upon the ground that they are taxable solely in Delaware. The question is whether they should be deemed to be localized in West Virginia.

"*Third.*—The Corporation established in West Virginia what has aptly been termed a 'commercial domicile.' It maintains its general business offices at Wheeling and there it keeps its books and accounting records. There its directors hold their meetings and its officers conduct the affairs of the Corporation. There, as appellant's counsel well says, 'the management functioned.' The Corporation has manufacturing plants and sales offices in other States. But what is done at those plants and offices is determined and controlled from the center of authority at Wheeling. The Corporation has made that the actual seat of its corporate government." (pp. 211-212.)

Again in *First Bank Corp. v. Minnesota,* 301 U. S. 234, 81 L. Ed. 1061, 57 S. Ct. 677, we find a case involving a corporation created in Delaware and having a commercial domicile in Minnesota. The question was the power of Minnesota to tax intangible assets of the corporation. The court said:

"It (plaintiff) insists that as the shares are properly taxable by the respective states of their origin, and as due process forbids the imposition of a property tax upon intangibles in more than one state, they cannot be taxed in Minnesota.

"The logic is inexorable if the premises are accepted. But we do not find it necessary to decide whether taxation of the shares in Montana or North Dakota is foreclosed by sustaining the Minnesota tax. Nor need we inquire whether a non-resident shareholder, by acquiring stock in a local corporation, so far subjects his investment to the control and laws of the state which has created the corporation as to preclude any objection, on grounds of due process, to the taxation of the shares there, even though they are subject to taxation elsewhere, at their business situs. We leave those questions open. It is enough for present purposes that this Court has often upheld and never denied the constitutional power to tax shares of stock at the place of the domicil of the owner. (Citing cases.) And it has fully recognized that the business situs of an intangible affords an adequate basis for fixing a place of taxation. (Citing cases.)

"The rule that property is subject to taxation at its situs, within the territorial jurisdiction of the taxing state, readily understood and applied with respect to tangibles, is in itself meaningless when applied to intangibles which, since they are without physical characteristics, can have no location in space. See *Wheeling Steel Corp. v. Fox,* supra, 209. The resort to a fiction by the attribution of a tax situs to an intangible is only a means of symbolizing, without fully revealing, those considerations which are persuasive grounds for deciding that a particular place is appropriate for the imposition of the tax. *Mobilia sequuntur personam,* which has won unqualified acceptance when applied to the taxation of intangibles, *Blodgett v. Silberman,* 277 U. S. 1, 9-10, states a rule without disclosing the reasons for it. *But we have recently had occasion to point out that enjoyment by the resident of a state of the protection of its laws is inseparable from responsibility for sharing the costs of its govern-*

*ment, and that a tax measured by the value of rights protected is but an equitable method of distributing the burdens of government among those who are privileged to enjoy its benefits.* See *New York ex rel. Cohn v. Graves,* 300 U. S. 308." (Italics supplied.) (pp. 239-241.)

In *Newark Fire Ins. Co. v. State Board,* 307 U. S. 313, 83 L. Ed. 1312, 59 S. Ct. 918, a corporation created by New Jersey law was attempting to avoid a tax upon intangibles by that state by claiming a commercial domicile and business situs of the property in New York. The court found a failure in the proof as to the connection of the corporation with New York. In *Memphis Gas Co. v. Beeler,* 315 U. S. 649, 86 L. Ed. 1090, 62 S. Ct. 857, the court again considered the case of a foreign corporation having a commercial domicile in Tennessee.

It would seem pertinent to inquire as to the nature of the so called domicile of a corporation in the state of its origin, and also as to the nature of a commercial domicile. The law as to corporations has grown through the years often by the use of various fictions. It will be remembered that for many years it was thought that the legal entity of a corporation could not exist outside of the state of its creation. It would seem that the concept of the domicile of origin of a corporation is an attempt to assign to the corporation a kind of state citizenship or character. The Fourteenth Amendment makes every citizen of the United States a citizen of the state in which he resides. So even a corporation, which is not a citizen, gains certain rights and is subject to the jurisdiction of the state of its origin—of its domicile. The concept of the national character —citizenship of corporations—is much clearer when the question is between independent states or nations. In the Anglo-American law the national character of a corporation is primarily of the nation of its origin, but other tests are often applied. (Hyde, 2 *International Law* [1945] 902-908.) In European countries, national character of corporations is often placed according to the nation of its home office—the *siege social.* (Hudson, *International Law* [1951] 154; Bishop, *International Law* [1953] 303.)

It should not be forgotten that international law controls the states of the United States in their relations one with another except as modified by the federal constitution. (*Kansas v. Colorado,* 185 U. S. 125, at p. 146, 46 L. Ed. 838, 22 S. Ct. 552; *Connecticut v. Massachusetts,* 282 U. S. 660, at p. 670, 75 L. Ed. 602, 51 S. Ct. 286.) In international law, a corporation is undoubtedly entitled to the

protection and subject to the jurisdiction of the state or nation of its national character, so as to a corporation having the state character of one of the states of the United States. It is well known that state character is usually taken from the state under whose laws the corporation is created, but where the corporation does absolutely no business in the state of its origin, and has its home office for the direction of its entire business in another state where its officers reside, where its corporate meetings are held—what then? Should not such a corporation be said to be of the character of the last state? Such a situation would seem to call for the application of the doctrine of *siege social* or of the commercial domicile. Cannot it be found that plaintiff in this case is in fact a Kansas corporation. Perhaps it still retains also some of its Delaware character at least in Delaware. But it is quite common for individuals to possess dual nationality. If the plaintiff possesses the character of a Kansas corporation by having a commercial domicile in the state— the state of *siege social,* then the doctrine of *mobilia sequuntur personam* would make the taxable situs of its intangible property in Kansas if that property has no business situs elsewhere.

But in this case now before the court, it is not necessary to rely on the old theory or fiction. It would seem to be an inescapable conclusion that both the business situs and taxable situs of the corporate stock owned by plaintiff are in Kansas.

In an attempt to refute the proposition that the business situs of the stocks in question is in Kansas, plaintiff urges that it is only an investor in securities, and that these stocks have nothing to do with its pipe line business. If this were true, which the findings of the trial court show is not correct, would that mean that the stocks were only taxable in Delaware?

The stocks are kept in Kansas (Finding 29) with the exception of the stock of the Great Lakes Pipe Line Company which was purchased at the time of plaintiff's incorporation from the Sinclair Oil Corporation in accord with an agreement with two national insurance companies under which agreement the insurance companies loaned plaintiff the sum of eighty million dollars. As a part of this agreement it would seem that the Great Lakes stock is kept in New York (Finding 30). The Part Interests department of the home office in Independence manages all the affairs and interests of plaintiff in these stock companies and as to the stock. It will be noticed that plaintiff does have power and authority

under its charter of incorporation to act as investor (Finding 1B2) as well as to own and operate pipe lines and other transportation facilities. But if plaintiff is only exercising this "second corporate power" under its charter, where would plaintiff say this business is carried on? Certainly, not in Delaware, where it is admitted plaintiff conducts no business of any kind. The stock is owned, managed and kept at the commercial domicile of plaintiff's entire business at Independence, Kansas. Even then the business situs of plaintiff's investing business must be in Kansas.

But the trial court found more concerning plaintiff's business. In Findings 21 to 32, inclusive, the court analyzes the whole manner of the plaintiff's business and finds that not only is plaintiff acting as an investor, but that it is investing only in stocks of companies which will in fact extend the pipe line system of the plaintiff.

While it will not be necessary to copy the findings referred to *supra,* it will be noted that in Finding 25, it is shown that the Part Interests department of plaintiff supervises the undivided interest lines, which are admitted by plaintiff to be part of the Sinclair system of pipe lines, and also supervises the plaintiff's interest in the pipe lines jointly owned by plaintiff through stock ownership. It is also the duty of this department to consider and appraise possibilities of participating in additional pipe line facilities either by way of undivided interests lines or jointly owned lines by way of corporate stock ownership. It is further shown that in participating in stock ownership companies of this character and in the formation of new companies of this type, the Part Interests department may and does call upon all of the facilities of the plaintiff company to aid in the formation and even the construction of such pipe lines.

We have not taken the space to set out all of Finding 31 in the appendix as to the details of each of the jointly owned stock companies as set forth by the trial court, but the court concluded the finding as follows:

"The Court further finds that in most of the companies that Sinclair actively participated in their formation. Sinclair furnished capital and also actively assisted in the engineering, planning and construction of the lines. For example, during its formative period the Platte Pipe Line Company was located in the Sinclair Building at Independence, Kansas. Sinclair Pipe Line Company loaned to Platte Pipe Line Company various of its key employees who assisted Platte Pipe Line Company in the acquisition of right of w·v, engineering of the line, and the construction of the line. Although not neces-

sarily true in all of the cases, Sinclair Pipe Line Company did in fact render active assistance in acquisition of right of way, engineering, planning and constructon of other of the pipe lines involved with the exception of Texas-New Mexico Pipe Line and Great Lakes Pipe Line."

Of course, plaintiff is represented on the board of directors of all of these jointly owned stock companies (Finding 21, II. I *et seq.*) with the exception of the Great Lakes Pipe Line Company as to which there is a special arrangement, see *supra.* Thus, plaintiff participates in the control of the stock companies. Plaintiff argues with much vehemence that plaintiff does not have complete control of the stock companies, but business has been carried on for centuries by joint ownership. Plaintiff does not have complete control of the undivided interest pipe lines, and raises no question concerning that means of doing business.

All in all, this court like the trial court "has some difficulty in perceiving any real practical difference insofar as the issues concerning this law suit are involved between the ownership of stock by plaintiff in another pipe line company and the ownership of an undivided interest in another pipe line system." (Finding 21 IC) Of course, in plaintiff's Exhibit "G" (see Finding 22) Sinclair reported to its stockholders and the public that there was no difference between the two types of ownership, but perhaps this was only a publicity gimmick as said in plaintiff's reply brief.

All of the plaintiff's objections to the findings of fact have been carefully considered and the court is of the opinion there is no material error in the findings. It is also of the opinion that the findings of fact fully support the conclusions of law, and that the decision of the trial court should be affirmed. It is so ordered.

### APPENDIX

#### "FINDINGS OF FACT.

#### "1.

"That plaintiff is a corporation organized and existing under and by virtue of the laws of the State of Delaware; that said corporation is qualified to do and transact business in the state of Kansas as a foreign corporation, and that said plaintiff at all times herein pertinent did maintain its principal business office and headquarters in Independence, Kansas. That said plaintiff maintained its commercial domicile at Independence, Kansas.

"(A) That the certificate of incorporation of Sinclair Pipe Line Company

was duly filed in the office of the Secretary of State of the State of Delaware on November 9, 1950.

"(B) That as declared in said certificate of incorporation by plaintiff, the nature of the business, or objects, or purposes, to be transacted, promoted or carried on by the corporation, among other things, were:

"1. To build, construct, equip, purchase, lease or otherwise acquire, hold, own, control, maintain and operate pipe lines, pipes, tubes, conduits, conveyors, tank cars, boats, barges or other conveyances, tanks, storage facilities, compressors, pump stations, booster stations, control stations, buildings and improvements, and all other necessary or desirable facilities, equipments and appurtenances (including but without limitation telegraph lines, telephone lines, radio communication systems and other systems or means of communication, water and gas lines and aircraft), for the receipt, gathering, transportation, carriage, conveyance, storage, handling, measuring, purchase, sale, marketing and distribution of crude petroleum and the products and byproducts thereof (including but without limitation gasoline, gas casinghead, kerosene, naphtha, natural gas and the products and by-products thereof including but without limitation natural gasoline and other liquefied gases), coal and all mineral or volatile substances and the products and by-products thereof, salt, brine, and other mineral solutions, both for itself and other persons and corporations for hire or otherwise.

"2. To acquire by purchase, subscription or otherwise, and to receive, hold, own, guarantee, sell, assign, exchange, transfer, mortgage, pledge or otherwise dispose of or deal in and with any of the shares of the capital stock, or any vote in trust certificates in respect to the shares of capital stock, script, warrants, rights, bonds, debentures, notes, trust receipts, and other securities, obligations, choses in action and evidences of indebtedness or interest issued or created by any corporations, joint stock companies, syndicates, associations, firms, trusts, or persons, public or private, or by the Government of the United States of America, or by any foreign government, or by any state, territory, province, municipality or other political sub-division, or by any governmental agency, and as owner thereof to possess and exercise all the rights, powers and privileges of ownership, including the right to execute consents and vote thereon, and to do any and all acts and things necessary or advisable for the preservation, protection, improvement, and enhancement in value thereof."

2.

The Court finds that plaintiff was authorized to do business in Kansas as a foreign corporation on December 15, 1950. That the nature and character of the business of said corporation was "Transportation of petroleum and its products by pipeline in interstate commerce."

FINDINGS 3, 4, 5, 6, 7, 8, 9, 10, 11.

All of these findings deal with the filing of plaintiff's tax returns before the State Commission of Revenue and Taxation for the year

1955 and the assessment of the tax on the property, together with the protest thereof by the plaintiff and need not be set out herein.

"12.

"The Court finds from the evidence that the Sinclair Pipe Line Company is a wholly owned subsidiary of the Sinclair Oil Corporation and that the said Sinclair Oil Corporation is organized under the laws of the State of New York. The Court finds that the Sinclair Oil Corporation bears the relationship of parent corporation to plaintiff, Sinclair Pipe Line Company.

"13.

"The Court further finds from the evidence that in addition to Sinclair Pipe Line Company that the Sinclair Oil Corporation has other wholly owned subsidiaries, some of which are as follows:

"Sinclair Oil and Gas Company, headquarters, Tulsa, Oklahoma, whose business is crude oil exploration and production in the United States and that a subsidiary of the Sinclair Oil and Gas Company, called Sinclair Canada Oil Company conducts similar operations in the Dominion of Canada.

"Sinclair Crude Oil Company, headquarters, Tulsa, Oklahoma, which engages in the purchase and sale of crude oil.

"Sinclair Refining Company, headquarters, New York City, New York, whose business is petroleum refining, product marketing and marine operations, and that in marketing operations, several Sinclair subsidiaries distribute under their own names in individual areas, such as Richfield Oil Corporation of New York, Sherwood Brothers, Inc., Baltimore, Maryland, Hughes Oil Company, Chicago, Illinois, Stoll Oil Refining Company, Louisville, Kentucky.

"Sinclair Research Laboratories, Inc., whose business is the research development of petroleum products.

"Sinclair Chemicals, Inc., New York, which engages in petrochemical development and marketing.

"14.

"The Court further finds that Sinclair Pipe Line Company as such publishes no annual report to stockholders and publishes no financial information available to the general public except that Sinclair Pipe Line Company does make a return and file such information as required of it by law with the Interstate Commerce Commission. The Court finds from the evidence that the Sinclair Oil Corporation publishes an annual report to the stockholders in booklet form. The Annual Reports of the Sinclair Oil Corporation for itself and subsidiaries for the years 1949, 1950, 1951, 1953, 1954, 1955, were marked in the trial of this action as Exhibits. Testimony therefrom was elicited from various witnesses and said Annual

Reports were offered in evidence and received. The court finds that each of these reports were signed by P. C. Spencer, President of the Sinclair Oil Corporation by the order of the Board of Directors of Sinclair Oil Corporation.

"15.

"The court finds that in each of these reports the word 'Sinclair' is used to describe the parent company Sinclair Oil Corporation and/or any of its subsidiaries, individually or collectively.

"16.

"The Court finds that the Sinclair Oil Corporation through its subsidiaries performs the functions and conducts the business of an integrated oil company. By that the Court means that the Sinclair Oil Corporation through subsidiaries, is engaged in all principal functions of the petroleum industry-production, transportation, manufacture and marketing. The Court further finds that in order for Sinclair (and here the Court uses the term Sinclair to mean and include all of the integrated functions of the various Sinclair companies) to operate profitably as a whole, it is necessary that the cost of each separate operation be kept under constant scrutiny and that it is necessary that each operation should stand on its own feet and carry its own burden of expense (1951 Annual Report, Page 3)."

17.

In this finding the Court showed the stock owned by the plaintiff in the various pipe line companies herein involved. The amount of stock in individual companies need not be set out and the companies involved were: Badger Pipe Line, Goodall Pipe Line, Great Lakes Pipe Line, Pawnee Pipe Line, Pioneer Pipe Line, Platte Pipe Line, Texas-New Mexico Pipe Line.

"18.

"The Court finds that Sinclair Pipe Line Company has no property and transacts no business within the State of Delaware in the general meaning of the terms. The Court does find that Sinclair Pipe Line Company has an office in the State of Delaware and maintains such records in the State of Delaware as are necessary to comply with the laws of the State of Delaware for incorporation purposes. The Court specifically finds that the State of Delaware is, so far as the Sinclair Pipe Line Company is concerned, its domicile,

a mere legal domicile, in which the corporation carries on none of its activities relating to its business operations.

## "19.

"The Court finds that the State of Delaware does not levy any tax upon plaintiff by reason of its ownership of stock in corporations here in question, and that no other state other than the state of Kansas has ever levied any tax upon plaintiff by reason of ownership of said stocks or asserted, or attempted to assert, any right to tax said stocks.

"(A) The Court finds that the commercial domicile of Sinclair Pipe Line Company is located at Independence, Kansas. The Court finds that all of the directors of said Company, with the exception of one director, live in Montgomery County, Kansas, and live either in or in the immediate vicinity of Independence, Kansas. The Court further finds that all of the officers of Sinclair Pipe Line Company live either in Independence, Kansas, or in the immediate vicinity thereof. The Court finds that the principal office of the Sinclair Pipe Line Company is located in a five-story stone and mortar building located in Independence, Kansas. That in the Annual Reports of the Sinclair Oil Corporation that Independence, Kansas, is listed as being the headquarters of Sinclair Pipe Line Company. The Court finds that Sinclair Pipe Line Company has approximately 475 employees in Independence, Kansas, and that the general accounting, engineering, legal and other main offices of the Company are located in said building in Independence, Kansas. The Court finds that the seat of the corporate government of Sinclair Pipe Line Company is in Independence, Kansas. The Court finds that the Company does have some other offices at various other locations but that none of the other locations may be considered in the same category as the office in Independence, Kansas.

"(B) The Court finds that the annual meeting of the stockholders of Sinclair Pipe Line Company is held in Independence, Kansas. That at said annual meeting of the stockholders a proxy of Sinclair Oil Corporation is given to various executives of Sinclair Pipe Line Company with instructions from Sinclair Oil Corporation as to the voting of said stock at the annual meeting. The Court finds that directions are given by the executive authority of the parent company to said proxy as to whom to elect as directors for Sinclair Pipe Line Company at said annual meeting. The Court further finds that the annual meeting of the directors is held at Inde-

pendence, Kansas, and that said directors are instructed by the executive authority of the parent company as to whom to elect as officers for Sinclair Pipe Line Company. The Court finds that customarily all meetings of the Board of Directors are held in Independence, Kansas, with the exception that on occasion meetings of the Board of Directors of Sinclair Pipe Line Company are held at other places, but that the customary and regular meeting place of the Board of Directors of Sinclair Pipe Line Company is at Independence, Kansas. The Court finds that one meeting of the Board of Directors of Sinclair Pipe Line Company was held in New York City, which meeting was held in the meeting room of the Board of Directors of Sinclair Oil Corporation.

"20.

"The Court finds that in order for Sinclair Oil Corporation, through its subsidiaries, to compete in modern business with other major oil companies that it is necessary that Sinclair Oil Corporation and its subsidiaries have adequate pipe line facilities for the transportation of crude oil and refined products. The Court finds that the Sinclair Pipe Line Company is the vehicle or instrumentality which furnishes such needed pipe line facilities to Sinclair Oil Corporation and its subsidiaries.

"21.

"The Court finds that the business of Sinclair Pipe Line Company, both from the statements contained in its Articles of Incorporation and in actual practice and effect, is as follows:

"A. To furnish the vehicle or provide the means and facilities for transporting crude oil and refined petroleum products in pipe lines for wholly owned subsidiaries of Sinclair Oil Corporation.

"B. In addition to furnishing such necessary facilities for subsidiaries of the Sinclair Oil Corporation that the business of the Sinclair Pipe Line Company is to furnish transportation of crude and refined petroleum products in pipe lines to any other company desiring to use the facilities of the Sinclair Pipe Line Company. That actually the business of the Sinclair Pipe Line Company is to transport in pipe lines crude oil and refined petroleum products for a profit.

"C. The Court further finds that the purchase and ownership by Sinclair Pipe Line Company of the shares of stock in other pipe line companies is for the furtherance and enhancement of the said business of Sinclair Pipe Line Company.

The Court further finds that at all times pertinent Sinclair Pipe

Line Company has used three types of ownership in order to carry out its business purposes above stated. These are:

"I. A. *Wholly owned lines.* Sinclair Pipe Line Company has certain wholly owned crude and products lines. These lines were either purchased by or constructed by Sinclair Pipe Line Company and are used by Sinclair Pipe Line Company for interstate and intrastate shipment of crude and refined petroleum products for subsidiaries of Sinclair Oil Corporation and for other companies.

"I. B. *Undivided interest lines.* In certain situations, Sinclair Pipe Line Company has associated itself with other parties (principally major oil companies) and built and constructed what are commonly referred to as undivided interest lines. In this type of ownership each of the participating companies owns a percentage of the space in the line in proportion to the respective contribution of capital by each company for the construction of the line. This type of ownership is not a partnership since each of the companies participating in the line owns an undivided interest in the line and is entitled to receive the transportation charges under its own tariffs for the oil transported through its space in the lines.

"I. C. *Stock company ownership.* This is the type of ownership with which we are here involved. In this situation Sinclair has associated itself with one or more major oil companies and such companies have contributed capital through the purchase of stock in a new corporation which the participating companies have caused to be created. Such new company has then caused a new pipe line facility to be built and constructed. The Court notes that in the case of the Goodall Pipe Line Company that Sinclair Pipe Line Company associated itself with an individual to form the new corporation rather than another major oil company and the Court also notes that the Texas-New Mexico Pipe Line Company was formed prior to the existence of Sinclair Pipe Line Company but finds that Consolidated Oil Corporation was one of the major oil companies participating in the formation of the Texas-New Mexico Pipe Line Company. That the name of the Consolidated Oil Corporation was subsequently changed to Sinclair Oil Corporation and that when Sinclair Pipe Line Company was organized that the shares of stock owned by Sinclair Oil Corporation by reason of the participation of Consolidated Oil Corporation in Texas-New Mexico Pipe Line Company were transferred or sold to Sinclair Pipe Line Company. The Court also notes that the shares of stock in the Great Lakes Pipe Line Company were owned by Sinclair Refining Company prior to the incorporation of Sinclair Pipe Line Company and that the shares of stock owned by Sinclair Refining Company were sold or transferred to Sinclair Pipe Line Company immediately after the organization of the Sinclair Pipe Line Company.

"The Court has some difficulty in perceiving any real practical difference insofar as the issues concerning this law suit are involved between the ownership of stock by plaintiff in another pipe line company and the ownership of an undivided interest in another pipe line system. However, since counsel for plaintiff has so con-

sistently and strongly urged the difference between the two types of organization, the Court makes the following findings:

"II. A. Whether the pipe lines are 'Wholly Owned,' 'Undivided interest lines,' or 'stock company ownership lines,' all of the pipe lines in which plaintiff owns an interest are operated either in interstate commerce or intrastate commerce. If operated in intrastate commerce the operation of such lines is subject to the control of such regulatory state bodies and administrative rules and regulations as may be prescribed by the law of the state in which such operation is conducted. If such lines operate in interstate commerce, then they are subject to the rules and regulations of the Interstate Commerce Commission and the laws of the United States of America pertaining to common carriers.

"II. B. The Court finds that crude oil and petroleum products move in pipe lines under what is commonly referred to as a 'tariff' which is the term used in the business to describe and designate the rate charged for the transportation service rendered by the transporting carrier.

"II. C. In many instances a movement of such crude or products in pipe lines will involve transportation through lines owned by two or more different carriers. In such cases the carrier which first receives the oil for movement is designated as the 'originating carrier.' Subsequent carriers are designated as 'connecting carriers.'

"II. D. The Court finds that the shipper or the party owning the oil and tendering the oil for movement through one line or a series of connecting lines designates the route over which such oil shall move, if there is more than one possible route for such movement.

"II. E. The Court also finds that the oil tendered for shipment at all times is the property of the shipper through its movement through one line or a series of connecting lines.

"II. F. The Court finds that in the case of a 'wholly owned' line that the company owning the line publishes tariffs under the control and subject to regulatory agencies covering the rates charged for movement in its wholly owned lines.

"II. G. In the case of connecting carriers, the Court finds that the rates for movement are governed by 'joint tariffs' which means that under a joint tariff a rate is published governing the movement of oil through two or more lines differently owned.

"II. H. In the case of the 'undivided ownership' lines in which plaintiff participates, the Court finds that each of the companies owns an undivided interest in the space or capacity of the line. That each participating party publishes its own tariffs. That if a shipper wishes to ship over the line, that the shipper tenders his oil for shipment directly to one of the owning companies and each owning company owning space in the line collects its own revenues from other shippers using its space in the line. The court finds that being a common carrier for hire, that all shipments tendered must be accepted providing there is sufficient capacity in the line, and that if the capacity of the line is not sufficient for all parties desiring to use it the capacity is pro rated among various shippers.

"II. I. In the case of the 'stock ownership' lines, the Court finds that each

such company is organized as a corporation. Each such corporation has a board of directors. Officers for each corporation are elected by the board of directors.

"II. J. The Court finds that each stock company publishes its own tariffs. In most instances the line is operated by the corporation through its own employees and personnel, although in some instances the line is operated and maintained under an operating agreement with one of the participating companies.

"II. K. The Court finds that with regard to the stock companies that the companies participating in the formation are represented on the board of directors of such company by employees of the respective participating companies in the approximate proportion that they have contributed to the capital of the company and own stock in said company.

"II. L. The Court finds that the stockholders of the respective stock ownership companies elect the directors at annual meetings of the stockholders held in accordance with the respective by-laws of the companies. That in each instance the participating companies elect employees of such participating companies in proportion to stock ownership. In this connection, however, the Court notes that in regard to the Great Lakes Pipe Line Company that Sinclair Pipe Line Company does not have any employee serving on the board of directors of the Great Lakes Pipe Line Company.

"II. M. The Court further finds that the board of directors of the various stock companies elect the officers for such respective companies.

"II. N. The Court further finds that the various companies owning stock in companies in question jointly participate in the management and control of these companies through representatives of the forming companies serving as officers and members on the boards of directors. Such forming companies own all of the stock of such companies.

"II. P. The Court finds that the said employees of the Sinclair Pipe Line Company serving on the various boards of directors or as officers of the stock companies involved, receive no compensation from the various companies for which they serve as directors or officers. The Court further finds that the meetings of such boards of directors are held at various places throughout the country. That said employees of Sinclair Pipe Line Company customarily attend such directors' meetings and that the expenses for travel, and other expenses incurred by them in connection with attending said meetings are borne by Sinclair Pipe Line Company.

"II. Q. That such employees of Sinclair Pipe Line Company so serving on the boards of directors of said companies represent the interests of Sinclair Pipe Line Company in said stock companies and the purpose of having said employees of Sinclair Pipe Line Company serve upon the various boards of directors is to represent and protect the interest of Sinclair Pipe Line Company in said stock companies.

"II. R. The Court further finds that Sinclair Pipe Line Company through its right to vote its stock at the annual stockholders meeting, and through its representatives upon the various boards of directors actively participates in the control and management of such companies in direct proportion to its ownership of the capital stock.

"22.

"The Court has examined with particular care plaintiff's Exhibit 'G' which was received in evidence, and which is a map published by plaintiff showing the various pipe line systems owned by plaintiff or in which plaintiff has interest. The Court has also examined the written statement contained on the reverse side of said Exhibit entitled 'Sinclair's Pipe Line Systems.'

"The Court finds that said statement is of particular value in understanding the operation of the Sinclair Pipe Line System and its place in the general structure of the Sinclair Oil Corporation and, therefore, makes the following finding of fact, in accordance with said statement therein contained: 'Crude Oil at a well head in Texas is of no value to the Sinclair Refinery in East Chicago, and gasoline in Houston is useless to a service station in Kansas City unless some effective method of transportation is employed. Petroleum, to be of value and service, must usually move over great distances before it can be utilized. Because pipe lines offer the lowest cost for overland movement of petroleum, they play a major role in this field. Sinclair has long recognized this fact, and through Sinclair Pipe Line Company (headquarters: Independence, Kansas) makes effective use of one of the largest pipe line systems in the world to transport, as a common carrier, crude oil and petroleum products for both Sinclair and other shippers. Sinclair's wholly owned and operated crude lines extend more than 8,700 miles and serve most of the major producing areas in the country. All of the Sinclair refineries are supplied with crude petroleum by pipe lines excepting the Marcus Hook, Pennsylvania, refinery, which is supplied by ocean tanker. These lines assure Sinclair's refineries steady supplies of the proper crude oils needed to make high grade Sinclair products. They operate 'round the clock, untroubled by many of the conditions which frequently hamper other methods of overland transportation. Sinclair's approximately 3,000 miles of wholly owned products pipe lines comprise the most extensive single products pipe line system in the whole world, and carry gasolines, heating oils, diesel oils, kerosene and various other refined products for Sinclair and other shippers into the most populous markets. They provide the lowest cost of transportation available in the areas served, an essential requirement in the highly competitive oil industry, where costs and prices must be figured to fractions of a cent. The magnitude of this wholly

owned crude and products pipe line system, which reaches from the Gulf of Mexico into the State of New Jersey, and a separate system serving the state of Wyoming is indicated by its annual delivery of approximately 135 million barrels of crude oil and 40 million barrels of refined petroleum products. Approximately 48 million people live within a 50 mile radius of Sinclair's wholly owned products lines, and over 82 million people—or more than half the population of the entire United States—live within the same 50 mile radius of Sinclair's wholly owned, jointly owned and connecting carrier lines. To supplement its wholly owned crude and products pipe lines, Sinclair is rapidly expanding its interests in pipe lines jointly owned and operated with other companies. These joint interest pipe lines, both crude and products, have now reached a total of approximately 10,000 miles.'

"24.

"To understand the integration of the Sinclair Oil Corporation and its subsidiaries and the place of the Sinclair Pipe Line Company in this integrated operation, the Court makes the following findings:

"A. The Sinclair Oil and Cas Company is the wholly owned subsidiary of Sinclair Oil Corporation which engages in prospecting and drilling for crude oil.

"B. After the crude oil is produced by Sinclair Oil and Gas Company it is purchased by the Sinclair Crude Oil Company.

"C. After the crude has been purchased by the Sinclair Crude Oil Company, some of it is then moved to refineries owned by the Sinclair Refining Company which is likewise a wholly owned subsidiary of Sinclair Oil Corporation. The crude remains the property of the Sinclair Crude Oil Company until it is delivered to and sold to the Sinclair Refining Company. The crude may be moved by various means, such as, barges, trucks, or pipe lines. However, pipe line transportation is the most economical and best for overland transportation and where overland transportation is necessary the crude is moved through pipe lines where at all possible.

"D. The Sinclair Pipe Linc Company through its ownership of wholly owned lines, or its ownership of interests in other lines (and by such ownership the Court refers to ownership either in undivided lines or stock company lines) furnishes the principal facility for such pipe line transportation to the Sinclair refineries. The Sinclair Pipe Line Company as such, regarding the Sinclair Pipe Line Company as a separate corporate entity, never at any time has any actual ownership of any crude oil or refined products. However, where possible, crude belonging to the Sinclair Crude Oil Company is shipped over the Sinclair Pipe Line System (meaning wholly owned lines, undivided interest lines, or stock company lines).

"E. After the refinery has refined crude oil then the products must be shipped to market. Various means are utilized for such shipment, such as, truck, barge, and pipe lines. However, for overland transportation of products

refined by Sinclair Refining Company and marketed by it, pipe line transportation is the best and most economical form of transportation. Where possible refined products are shipped over products lines owned by Sinclair Pipe Line Company, or in which it has an interest.

"25.

"The Court finds that the Sinclair Pipe Line Company maintains at Independence, Kansas, a department which is known as the part interests department. In 1955, Mr. Earl W. Unruh, who is now president of The Sinclair Pipe Line Company, bore the title of part interests executive and was in charge of that department. The Court finds that it is the function of the part interests department to look after and supervise the interests of Sinclair Pipe Line Company in the undivided interests lines and also the interests of Sinclair Pipe Line Company in the stock ownership companies.

"In addition to such function it is the function of this department to serve and appraise the possibility or feasibility of Sinclair Pipe Line Company participating in other and additional pipe line facilities. That it is the function of this department to appraise and consider participation in further undivided interest lines as well as further participation in stock ownership lines.

"The Court finds that when the said part interest department is considering participation in other such lines that it has available and may call on and does call upon all the facilities of the Sinclair Pipe Line Company, including any of its departments whose services may be necessary or desirable such as the engineering department, accounting department and legal department for advice and assistance in its consideration of such participation in such other lines.

"26.

"The Court finds that the Sinclair Pipe Line Company through its part interest department has never considered, nor is it now considering, participation in any additional pipe line facilities which have not or would not directly or indirectly serve some wholly owned subsidiary of the Sinclair Oil Corporation.

"27.

"The Court finds that prior to the formation of the Sinclair Pipe Line Company that Sinclair Refining Company Pipe Line Division performed the functions of supplying pipe line transportation for Sinclair Oil Corporation and its subsidiaries now performed by Sinclair Pipe Line Company. The Court finds that the Sinclair Pipe Line Company was organized to own and operate the pipe line

properties previously operated as a department of the Sinclair Refining Company. The Court finds that most of the pipe line facilities of Sinclair Refining Company were transferred to Sinclair Pipe Line Company after its organization. The Court finds that this step was taken for the purpose of obtaining increased operating efficiency and to enable Sinclair Oil Corporation and its subsidiaries better to supply the increasing demands of refineries for raw material and to more efficiently accomplish distribution of products (1950 Annual Report).

"28.

"The Court finds that Sinclair Pipe Line Company was organized for profit and that any profit made by the Sinclair Pipe Line Company enures solely and only for the benefit of its only stockholder, Sinclair Oil Corporation. The Court finds that since its organization in 1951 that it has been the custom and practice of the Sinclair Pipe Line Company to keep all dividends received by it resulting from ownership of stock in the various stock companies in a segregated account and when a dividend is paid by Sinclair Pipe Line Company to Sinclair Oil Corporation to specifically designate which part of the dividend is paid with funds resulting from dividends received from other companies and which part is paid out of operating revenues. The Court, however, attaches no particular significance to the segregation of such dividends since from the evidence the Court finds that the dividends paid to the parent company representing receipt of dividends resulting from stock ownership formed a significant part of the total dividends paid. The Court finds that on December 14, 1954, a dividend of three million dollars was declared by Sinclair Pipe Line Company. Of this amount $1,251,652.00 was designated as coming from dividends received and the sum of $1,748,348.00 was designated as coming from current earnings from operations. The Court finds that of said dividend of $3,000,000.00 that 42% of said dividend resulted from ownership by Sinclair Pipe Line Company of the various stocks here involved, and that the use of these dividends resulting from stock ownership as part of the dividend paid to the parent company released exactly that additional amount of earnings from operations by it for use in its business operations. The Court also finds from testimony of Mr. J. H. Amend, auditor of the company, that it made no practical difference whether such dividend of $3,000,000.00 was declared from earnings or from earnings and dividends received. The Court also specifi-

cally finds that said policy of segregating dividends received from stock ownership was in effect during the years 1951, 1952, 1953, 1954, in which years the Sinclair Pipe Line Company paid the intangible tax levied upon its ownership of said stock without protest.

"29.

"The Court further finds from the evidence that the actual certificates evidencing the ownership of Sinclair Pipe Line Company of the various shares of stocks in the companies here involved are all located in a safety deposit vault owned by Sinclair Pipe Line Company in Independence, Kansas, with the exception of the certificate or certificates, evidencing the ownership of stock in Great Lakes Pipe Line Company, which certificate is located in a safety deposit box in New York City.

"30.

"The Court further finds that the Sinclair Pipe Line Company was commenced, or that the business of the Company was started with a paid capital of $100,000.00. The Court further finds that under certain debenture purchase and debenture agreements executed between plaintiff and the Equitable Life Assurance Society of the United States and Metropolitan Insurance Company, that Sinclair Pipe Line Company borrowed the sum of $80,000,000.00. That among other requirements contained in said debenture purchase agreements and in said debenture agreement it was required of plaintiff that plaintiff should have acquired from Sinclair Refining Company shares of stock in the Great Lakes Pipe Line Company which plaintiff now owns, and also that it should have acquired from Sinclair Oil Corporation the stock of the Texas-New Mexico Pipe Line Company which it now owns, and that it should have acquired from Sinclair Oil Corporation the shares of stock in Platte Pipe Line Company which it now owns, with the exception of 750 shares of stock of the Platte Pipe Line Company subsequently acquired. That said debenture agreement further required that Sinclair Pipe Line Company should assume the obligation of Sinclair Oil Corporation to loan to Platte Pipe Line Company the sum of $540,000.00. The Court further finds that said Sinclair Pipe Line Company subsequently did loan to Platte Pipe Line Company the sum of $540,000.00. The Court further finds that the said Annual Report of the Sinclair Oil Corporation and its subsidiaries is the only general report made available to the public of the operations and

financial status of the Sinclair Oil Corporation and its subsidiary companies other than such information as is required by law to be filed with the Interstate Commerce Commission. The Court finds that said Annual Reports contain a consolidated balance sheet showing all of the assets of the subsidiaries of Sinclair Oil Corporation as well as consolidated statement of liabilities and earnings. The Court finds that said consolidated balance sheet shows the value of the stocks in question owned by the Sinclair Pipe Line Company as being a part of the consolidated assets of Sinclair Oil Corporation and its subsidiaries. Likewise, the Court finds that the liabilities of Sinclair Pipe Line Company such as the 25 year 3⅜% sinking fund debentures referred to in the previous findings are shown as a liability in the consolidated balance sheet. Likewise, the Court finds that the dividends received by Sinclair Pipe Line Company from the stocks in question are reflected in the consolidated earnings statement. For example, the Court finds that in 1955 the consolidated income statement showed that in 1955 Sinclair Oil Corporation had a net income of $6.01 per share. The Court finds that the dividends received by Sinclair Pipe Line Company and paid to Sinclair Oil Corporation were reflected in and showed as a part of the said figure of $6.01 per share reported in the Consolidated Income Statement of Sinclair Oil Corporation."

NOTE: In Finding No. 31, the court found the specific facts concerning all of the companies in which the plaintiff owned stock and their connections to the plaintiff's business. Finding No. 32 concerns the dividends received from the stock owned by the plaintiff.