FOURNET, Chief Justice.
 

 This action was instituted by the United States Gas Corporation to recover $237,-620.46, with interest, the amount paid by it under protest to the State of Louisiana as income tax for the year 1949, and, from a judgment ordering the refund of this amount as prayed, the state prosecutes this appeal.
 

 According to the record it appears that at the time and in the manner required by law appellee — a corporation chartered under the laws of Delaware with the designation therein of Dover, Delaware, as its domicile, its principal place of business being maintained at Shreveport, Louisiana — filed with the Louisiana Department of Revenue a report of its income for the year 1949
 
 *493
 
 showing the total amount of tax due the state thereon to be $23,360.92, which it paid. A subsequent audit of this return by the office of the Collector of Revenue revealed the corporation failed to include therein and pay for that year tax on the following items of income: (1) $5,852,-819.49, profit- received from the sale of stock it owned in the Mississippi River Fuel Corporation, (2) $137,599.60, received as dividends on this stock, and (3) $178,-668.79, which the corporation received during 1949 as interest from the Federal government on a refund of income taxes paid by it for the year 1936. The Collector, pursuant to the provisions of Section 64 of Act 354 of 1948 — the portions thereof pertinent to a decision here being identical with Section 47:243 of the Revised Statutes of 1950 and will be thus cited in future reference — therefore levied a deficiency tax assessment against the corporation on these items of income, computing the additional amount of tax due the state for the year 1949 to be $188,400.76, which, with accrued interest of $49,216.70, totalled $237,620.46.
 

 The corporation paid this amount under protest and, within the time prescribed by law, instituted this suit for its recovery, the principal contention being that these items constitute intangible assets of a nonresident corporation that, under Louisiana law, can only be included in the computation of allocable items from Louisiana sources for income tax purposes where they have acquired a “business situs” in this state by reason of their use here in connection with the taxpayer’s business: consequently, it is asserted, since these assets never acquired such a situs in this state, the Collector’s interpretation of R.S. 47:243,
 
 [1]
 
 subjecting them to the income tax laws of Louisiana on the theory the corporation has a “commercial domicile” here, is arbitrary, unreasonable, and beyond the taxing power or jurisdiction of Louisiana, constituting (1) an unlawful burden on interstate commerce in violation of Section 8 of Article I of the Constitution of the United States, (2) a taking of the property of the corporation without due process of law in violation of Section 2 of Article J
 
 *495
 
 of the Constitution of Louisiana and the Fourteenth Amendment to the Constitution of the United States, and, further (3), is discriminatory in that it taxes the intangible assets of a non-resident corporation on a different basis than that used in taxing like assets of non-resident individuals, in contravention of the equal protection guarantee of the Fourteenth Amendment to the Constitution of the United States. In the alternative, it is contended that should the court conclude the intangibles in question did acquire a situs in Louisiana for any reason, then the income from the sale of the Mississippi River Fuel Corporation stock constituted a capital gain as a result of an interstate sale, and the allocation of the entire gain from such transaction to Louisiana for income tax purposes is a burden on interstate commerce, in violation of Section 8 of Article I of the Constitution of the United States.
 
 [2]
 

 In the event this court concludes these items are taxable as income attributable to Louisiana for the year 1949 without violence being done-to any of these constitutional provisions, it is then pleaded — although these contentions have apparently-been abandoned as they were never argued in this court either orally or in brief — that the state erred (1) in finding the cost basis of the stock in the Mississippi River-Fuel Corporation sold in 1949 to be the same as that used for computation of Federal income taxes for that year, or $8,-864,952, resulting in a gain or profit from the sale of this capital asset of $5,852,819.-49, contending (a) that since this stock was never used in connection with plaintiff’s business within Louisiana and never physically present in this state until April 30, 1945, the cost basis should be the value-of the stock at that time, which was $7,-
 
 *497
 

 ■642,200, or (b)
 
 its value as of July 24, 1937, the day on which the plaintiff was first authorized to do business in Louisiana — $7,525,426; and (2) inasmuch as the interest paid plaintiff by the United States was in connection with a refund of Fed■eral income taxes collected from plaintiff in 1936, at which time it was not doing business in Louisiana, the Collector was without right or authority to treat this interest ■as Louisiana income for 1949, even though paid it by the Federal government during that year, particularly since the refund was authorized under a Federal statute enacted in 1942 eliminating taxes on undistributed profits of any company in a deficit position in the year for which such tax had been •collected.
 

 The location of property is commonly known in law as its “situs.” It may be said that in-general, for purposes of due process within the meaning of the Fourteenth Amendment, it is necessary for a state to have jurisdiction over the property for it to be there subjected to taxation. In •determining this taxation “jurisdiction,” or “situs,” two opposed considerations — place of ownership and place of property location —have, from the beginning, given rise to legal difficulties. If the property is realty, the solution has been fairly simple. In respect to determination of the place of “jurisdiction” of personalty, the difficulties have been more real and complex, and have resulted in a cleavage between rules of law applicable to tangibles and intangibles attributable to the fact that as to tangibles they possess a form or substance that permits one place to exert dominion over them to the exclusion of others.
 

 Because by their very nature intangible assets and property rights have no physical location, even though represented by paper evidences such as stock certificates, being merely relationships between persons that the law recognizes by attaching to them certain sanctions enforceable in the courts (Curry v. McCanless, 307 U.S. 357, 59 S.Ct. 900, 905, 83 L.Ed. 1339),
 
 [3]
 
 the problem of determining their “situs,” or the state having jurisdiction to tax them, has presented even more complex difficulties — particularly
 
 *499
 
 under rapidly changing economic and business conditions developing during this industrialized age — involving considerations that are partially theoretical, logical, practical, and legal, and which turn, eventually, not only on the particular provisions of a statute, if one is involved, but also on the jurisprudence and the facts, primarily the latter. However, because these intangibles do constitute valuable property rights and should, therefore, bear their just burden of the cost of government, a situs has been ascribed to them for taxation purposes through a fiction of the law that is easily traceable to the first part of the ancient Roman maxim “mobilia sequuntur person-am, immobilia sitúa” (movable things, or movables, follow the person; immovable, their locality).
 

 This meant, simply, that tangible, or movable, property was regarded as being located at the legal domicile of the owner for the purpose of applying the law of that place to it in many situations, of which taxation was but one, although the property might, actually, be located elsewhere. From the standpoint of taxation, this fiction as originally applied permitted the state of the owner’s legal domicile to impose a tax on his personalty wherever located under the theory it had jurisdiction over such property because it had there acquired a “situs” since it followed the owner and was, consequently, attached to his person at his legal domicile.
 

 However, the application of this fiction by the courts to the taxation of
 
 tangible
 
 personalty was not unassailable, and, being a court made rule designed to work out practical justice, where the reason for its existence no longer obtained and it became evident the facts of the case could not justify a strict adherence thereto, there was a deviation or departure from its application, as, for example, where the facts showed the location of the personalty had such permanence in another state it was regarded as a part of the property of that state, which alone had jurisdiction over it, physical location and permanency being the determinative features that led to the development of the exception to the mobilia rule that permitted a state other than the legal domicile of the owner to tax the
 
 tangible
 
 property in the foreign state. See, for example, City of St. Louis v. Wiggins Ferry Co., 11 Wall. 423, 20 L.Ed. 192; Morgan v. Parham, 16 Wall. 471, 21 L.Ed. 303; Union Refrigerator Transit Co. v. Commonwealth of Kentucky, 199 U.S. 194, 26 S.Ct. 36, 50 L.Ed. 150; Frick v. Commonwealth of Pennsylvania, 268 U.S. 473, 45 S.Ct. 603, 69 L.Ed. 1058; Curry v. McCanless, supra; Smith v. Ajax Pipe Line Co., 8 Cir., 87 F.2d 567, and the authorities therein cited. The theory underlying this exception in so far as it concerned tangible personal property meant, essentially, that the benefit and protection of the laws enabling the owner to enjoy the fruits of his ownership was re
 
 *501
 
 •stricted to the state in whose territory the physical property was located; in other words, he was protected in his ownership •and enjoyment of the tangible by the state where it was located to a greater degree than by the state of his domicile. See, Southern Pacific Co. v. McColgan, 68 Cal. App.2d 48, 156 P.2d 81, and Curry v. McCanless, supra.
 

 This concept found its way into most legal systems, including the common law, ■and these courts, in an analogous but much later development, classifying intangible as•sets and interests in the same category as tangible movables, have, traditionally, under the mobilia maxim, held their situs to be the ■domicile of the owner of the intangible and •usually taxable there,
 
 unless there existed ■a specific law to the contrary.
 
 Thus, under this fiction, identification and association in the mind of intangibles with their owners (as in the case of movable tangibles and personalty) gave them, in the law, a “situs” at the legal domicile of the owner.
 

 Because during the early years of their history the separate legal entities known as •corporations generally maintained their principal place of business and operated almost exclusively within the confines of the state of incorporation, benefiting there, more so than in any- other state, from the functions and protection of government, particularly with respect to intangible interests, the courts transferred the mobilia fiction that the situs of the intangible is the domicile of the owner to the corporate body — considered to be, in actuality, an artificially created invisible and intangible being, yet a person in contemplation of law —and applying to the intangibles of such legal entities the mobilia maxim, held thereunder their situs, as in the case of individuals, to be the legal domicile of the corporation — the state of incorporation- — for taxation purposes. As pointed out in Southern Pacific Co. v. McColgan, supra, [68 Cal.App.2d 48, 156 P.2d 93] “The rule that ascribed to intangibles a taxable situs at the domicile of the owner developed when corporate operations were less complex than now * * *. Thus it was the fact that the corporation carried on its activities in the state of incorporation and generally had its principal place of business there” that led the courts to apply the mobilia rule to the taxation of the intangibles of such entities.
 

 However, this field of the law was then in its infancy and consideration of the varying factors deemed to control the determination of the domicile of such artificial legal entities still in the process of development. As these corporations grew, becoming vital and gigantic essential factors in our modern industrialized economic and business life and extending their activities into national and international fields, their operations became so complex it was, ill many instances, almost impossible to pierce the corporate veil in order to perceive in
 
 *503
 
 the tangled threads of interlocking directorates and corporations — parent, holding, and subsidiary — just where the boundary lines affecting such entities began and ended for the purpose of taxation at the state and local level.
 

 In time the courts, aware that the confinement of the domicile of such corporations within the boundaries of the incorporating state had become an anachronism in the economic life of the country because they were incorporating in one state with no intention of there maintaining the principal place of business, or of even doing business in that state, complying only with the minimum requirements for corporate existence under its laws;
 

 [4]
 

 and mindful of the fact that the formalistic and arbitrary application of the fictional mobilia rule to the taxation of the intangible interests of such corporations was denying to other states — where they had “taken up a home”
 
 [5]
 
 and in which these entities with respect to such intangibles were actually, and to a greater extent, benefiting from the functions and protection of government — their fair and constitutional share of the tax burden, began to look into the “realities” of each situation, as they had with respect to-the tangible personalty and movables as-above mentioned, and to either apply or disregard the rule wherever the facts of the-case so warranted, permitting taxation off intangibles by the state where they were being employed in such a way as to permit the owners to benefit from the protection of its laws in the enjoyment of the fruits, from such interests. As expressed in Burnet v. Wells, 289 U.S. 670, 53 S.Ct. 761, 764, 77 L.Ed. 1439, where the question became-one of power to tax, the courts concluded they must deal with it “in a large way * * * not narrowly or pendantically, in. slavery to forms or phrases.”
 

 Out of these cases grew the exception to the rule that the incorporating state-as the legal domicile could alone tax intangible interests of such entities that permitted a state — in which a foreign corporation engaged in activities in connection with its intangibles there in such a way as to-bring them under the protection of that state more so than that of the incorporating state-—to tax these intangibles on the theory they had acquired in the foreign state what is. termed a “business situs,” physical evidences-
 
 *505
 
 of the presence of these intangibles within the state not being a prerequisite, as had been the case in the deviation from the mobilia rule with respect to tangible personalty permanently located in a state other than that of the owner’s domicile. See, Cream of Wheat Co. v. County of Grand Forks, 253 U.S. 325, 40 S.Ct. 558, 64 L.Ed. 931; Guaranty Trust Co. of New York v. Commonwealth of Virginia, 305 U.S. 19, 59 S.Ct. 1, 83 L.Ed. 16; Southern Pacific Co. v. McColgan, supra, and the cases therein cited.
 

 Primarily this exception was developed to allow the non-domiciliary state where the owner was there engaging in activities with respect to the intangibles with the view to profit outside the legal domicile, or, as sometimes characterized, as having there “become an integral part” of a local business,
 
 [6]
 
 to tax these interests on the basis of the benefit and protection there conferred, as in the case of the exception to the mobilia rule as developed with respect to tangible property. It should be stressed, however, that although we are here considering the development of the “business situs” exception to the mobilia rule as it affects
 
 corporations,
 
 it was not limited in its application to such legal entities. The “business situs” exception applies likewise to trusts, partnerships, companies, and individuals.
 
 [7]
 
 See, City of New Orleans v. Stempel, 175 U.S. 309, 20 S.Ct. 110, 44 L.Ed. 174; Bristol v.
 
 *507
 
 Washington County, 177 U.S. 133, 20 S.Ct. 746, 44 L.Ed. 701; State Board of Assessors of Parish of Orleans v. Comptoir National D’Escompte, 191 U.S. 388, 24 S.Ct. 109, 48 L.Ed. 232; Liverpool & London & Globe Ins. Co. of New York v. Board of Assessors for Parish of Orleans, 221 U.S. 346, 31 S.Ct. 550, 55 L.Ed. 762. See, also, Cooley, Taxation (4th ed.) 806, and the annotations at 79 A.L.R. 344 and 143 A.L.R. 361.
 

 Eventually it became evident that just as domicile as distinguished from residence has proven to be an unsatisfactory test for the taxation of the income of individuals, likewise domicile, if limited to the state of incorporation, is an unsatisfactory test of jurisdiction for taxing corporations. Consequently, and traceable directly to the holding in the leading case of Wheeling Steel Corp. v. Fox, 298 U.S. 193, 56 S.Ct. 773, 80 L.Ed. 1143, that affirmed Re Wheeling Steel Corporation Assessment, 115 W.Va. 553, 177 S.E. 535, 104 A.L.R. 802, decided by the United States Supreme Court as long ago as 1936, a new and additional concept of
 
 corporate domicile
 
 separate and apart from the legal domicile in the incorporating state has developed, and the rule with respect to which state may tax its intangibles greatly extended, giving rise to another and independent exception to the artificial and fictional concept of the mobilia rule as originally applied to intangibles of these legal entities that seems peculiar to them alone.
 

 Under this exception, a state is permitted to tax the income from the intangible interests of a foreign corporation operating within its borders if it is established the foreign corporation has, within the state, what is termed its “commercial domicile,” a phrase said to have been coined in the Wheeling case.
 
 [8]
 
 Such a domicile exists where the corporation maintains a “paper domicile” in the incorporating state, the sole function performed there being, as expressed in Southern Pacific Co. v. McColgan, supra, [68 Cal.App.2d 48, 156 P.2d 100] to “breathe life into the corporation,” while the corporation actually functions and is managed from offices maintained in another state. Or, as expressed by Mr. Justice Cardozo in International Milling Co. v. Columbia Transp. Co., 292 U.S. 511, 54 S.Ct. 797, 799, 78 L.Ed. 1396, “For many purposes, its domicile in law is in the state of its creation, but it is living its life elsewhere.” The United States Supreme Court pointed out in the Wheeling case, supra, that to hold the intangibles under such circumstances to be taxable in the state of incorporation to the exclusion of the state where management functions would “make a legal fiction dominate realities.” [298 U.
 
 *509
 
 S. 193, 56 S.Ct. 777] In other words, the “commercial domicile” exists where the principal place of business is located and from which the corporation’s activities function and are managed.
 

 The concept underlying the “commercial domicile” exception is that it is the better view to ignore the mere semblance of a domicile of a corporation created by technical compliance with the legal requirements of the incorporating state, i. e., a technical or “paper” domicile, and to permit, for tax purposes, the substantial domicile of the corporation, based on the actual commercial practices of the particular corporation, to prevail, since that state is, obviously, furnishing the bulk of governmental protection to the corporation. See 104 A.L.R. at page 812.
 

 The cases developing this exception permit the state where the “commercial domicile” is found to exist, and where, therefore, the intangibles of the corporation are considered, in law, to have their “situs,” to tax the income of these foreign corporations, including income from intangible interests and from extraterritorial sources, under the theory that such income
 
 is actually derived from sources having a ,rsitus" within the state, and, accordingly, taxable under its laws even though the tax sought to be levied may be confined to income from local sources.
 
 Thus, as now well established in the jurisprudence under this separate and independent exception to the mobilia rule, the state where the corporation’s “commercial domicile” exists is, in effect, placed on a parity with the legal domicile of an individual (Cargill, Inc. v. Spaeth, 215 Minn. 540, 10 N.W.2d 728), and it may, therefore, “upon the soundest principles subject its intangible property to the income tax laws of the state, wherever located, as if it were a ‘citizen’ of that State” (Chestnut Securities Co. v. Oklahoma Tax Commission, 10 Cir., 125 F.2d 571, 576, certiorari denied, 316 U. S. 668, 62 S.Ct. 1035, 86 L.Ed. 1744), without violence being done to the due process and equal protection guarantees of state and national constitutions, or the interstate commerce clause of the Constitution of the United States, unless it is established by the evidence such taxation does, iri fact, place an undue burden on interstate commerce. See, Re Wheeling Steel Corporation, 115 W.Va. 553, 177 S.E. 535, 104 A.L.R. 802, affirmed in Wheeling Steel Corp. v. Fox, 298 U.S. 193, 56 S.Ct. 773, 80 L.Ed. 1143; Southern Pacific Co. v. McColgan, 68 Cal.App.2d 48, 156 P.2d 81; Smith v. Ajax Pipe Line Co., 8 Cir., 87 F.2d 567; First Bank Stock Corp. v. State of Minnesota, 301 U.S. 234, 57 S.Ct. 677, 81 L.Ed. 1061, 113 A.L.R. 228, affirming 197 Minn. 544, 267 N.W. 519, 269 N.W. 37; Memphis Natural Gas Co. v. Beeler, 315 U.S. 649, 62 S.Ct. 857, 86 L.Ed. 1090; Southern Natural Gas Corp. v. State of Alabama, 301 U.S. 148,
 
 *511
 
 57 S.Ct. 696, 81 L.Ed. 970; Wirt Franklin Petroleum Corp. v. Gruen, 5 Cir., 139 F.2d 659; Maryland & Virginia Milk Producers’ Ass’n v. District of Columbia, 73 App.D.C. 399, 119 F.2d 787; Cargill, Inc. v. Spaeth, 215 Minn. 540, 10 N.W.2d 728; Chestnut Securities Co. v. Oklahoma Tax Comm., 10 Cir., 125 F.2d 571, certiorari denied 316 U.S. 668, 62 S.Ct. 1035, 86 L.Ed. 1744; Pacific Western Oil Corp. v. Franchise Tax Board, 136 Cal.App.2d 794, 289 P.2d 287; Sinclair Pipe Line Co. v. State Commission of Revenue and Taxation, 184 Kan. 713, 339 P.2d 341; Fidelity & Columbia Trust Co. v. City of Louisville, 245 U. S. 54, 38 S.Ct. 40, 62 L.Ed. 145; Canisteo Corp. v. Spaeth, 211 Minn. 185, 300 N.W. 596; Spector Motor Service, Inc. v. Walsh, 2 Cir., 139 F.2d 809, reversed on other grounds at 323 U.S. 101, 65 S.Ct. 152, 89 L. Ed. 101; Minnesota Tribune Co. v. Commissioner of Taxation, 228 Minn. 452, 37 N.W.2d 737; Chicago, Duluth & Georgian Bay Transit Co. v. Michigan Corporation & Securities Commission, 319 Mich. 14, 29 N.W.2d 303, and the authorities therein cited. See, also, 85 U. of Penn.Law Rev. 121; Ramsey, “New Theory of Corporate Domicile for Tax Purposes,” 23 Am.Bar Assn. Journal 543; 35 Mich.Law Rev. 1032; “Allocation of Income in State Taxation” (2d ed.), by Altman and Keesling, pages 11, 29, 30, 34, 64—66, 75; 23 Am.Jur., Foreign Corporation, 104, Section 98; the annotations at 104 A.L.R. 806, 113 A.L.R. 228; 143 A.L.R. 369 and 370, and 67 A.L.R.2d pages 1338, 1339, 1343-1351; as well as the excellent dissent in Marshall-Wells Co. v. Commissioner of Taxation, 220 Minn. 458, 20 N.W.2d 92,
 
 [9]
 
 beginning at page 98 of the North Western report. See, further, the separate treatment given the “business situs” and “commercial domicile” phrases in 5 Words and Phrases 1046, and 7A Words and Phrases 530.
 
 [10]
 

 Plaintiff’s contention that the case of Wheeling Steel Corp. v. Fox, supra, cited in Footnote No. 2 as among the authorities relied on, is authority for the prop
 
 *513
 
 osition that although the corporation is found to have a “commercial domicile” in a foreign state, it must also be established the intangibles sought to be taxed were there used in such a way as to have acquired a “business situs,” is without merit. That there is a clear distinction between the “business situs” and the “commercial domicile” exceptions is evident from the above discussion of the law and the authorities just referred to. For example, in his work on “Conflicts of Law,” Goodrich emphasizes that “The Supreme Court permitted this taxation, pointing out that the assets in question had acquired a business situs in West Virginia, and that the corporation had a ‘commercial domicile’ there.
 
 It seems that in cases of this
 
 sort,
 
 the so-called commercial domicile is the important factor to search for. Once it appears that a foreign corporation has made the taxing state the real center of its business activity it is proper for the taxing state to treat the corporation as sufficiently connected with the state to render its intangible property taxable there. The conclusion that this is the real basis of the Wheeling Steel decision is strengthened by a still more recent case,”
 
 i. e., First Bank Stock Corp. v. State of Minnesota, 301 U.S. 234, 57 S.Ct. 677, 81 L. Ed. 1061, 113 A.L.R. 228. (The emphasis has been supplied.)
 

 This distinction is further emphasized by the following comment of the annotator at 113 A.L.R. 234: “The Wheeling Steel Corp. case upheld the power of the state in which a corporation organized in another state had its chief place of business to impose a property tax on intangibles * * * on the ground that the corporation had acquired what might be designated as a ‘commercial domicil’ in West Virginia, from which state it managed and conducted its manufacturing business and sales offices in other states. While the conception of business situs of intangibles as justifying their taxation at such situs was emphasized in the * * * case * * *
 
 it seems that the ratio decidendi was not the business situs of the property itself,
 
 since the bank deposits and accounts receivable sought to be taxed were in banks in other states,
 
 but the concept of ‘commercial domicil’ of their owner in West
 
 Virginia,
 
 and the ‘localization of the property’ in West
 
 Virginia,
 
 spoken of in that case was a localization not directly springing from use of the property in the state in the conduct of a business there
 
 (which would seem to be the criterion of a business situs),
 
 but indirectly from the localization of the owner’s 'commercial domicil’ in the state.
 
 As pointed out in the annotation in 104 A.L.R. 806 * * *,
 
 these are two different concepts
 
 and are not necessarily interdependent. The basis of the claim to tax in the one case is jurisdiction over the res itself, while in the other it is jurisdiction over the corporation itself, analogous to the jurisdiction of the state of its legal domicil.
 
 *515
 
 While business situs of property used in the owner’s business
 
 frequently coincides
 
 with the commercial domicil of its owner, yet it is not a necessary incident thereof, and a corporation maintaining its chief place of business in one state may have intangibles used as a part of business conducted in another state so as to have acquired a business situs in such other state, and vice versa.” See, also, the annotation at 143 A.L.R. 369, 370. (The emphasis has been supplied.)
 

 It is thus clear from the foregoing that the evolving jurisprudence has developed three more or less separate and distinct doctrines applicable to the taxation of intangible interests and property. The first is that, normally, intangibles are taxable at the legal domicile of the owner on the basis of the mobilia maxim, which, in the case of a corporation, is the state of incorporation. The second is that if the intangibles are used in another state in such a way as to there “become an integral part”
 
 [11]
 
 of a business carried on within the foreign state, that state may tax such intangibles on the basis of a “business situs” acquired there. And the third is that where the business of a corporation is so localized as to its commercial practices as to be actually managed and functioning in a state other than the state of incorporation (which is to it but a “paper” domicile as distinguished from a real domicile), though its activities reach
 
 into two or
 
 more states, there may be, for tax purposes, a “commercial domicile” sufficient to permit the state where the corporation has its chief place of business, and where the management functions are exercised, to tax all of the intangibles of the corporation.
 

 The trial judge, while recognizing that under the facts of this case the “commercial domicile” of the plaintiff corporation is, unquestionably, in Louisiana, nevertheless ordered refunded to the corporation the additional assessment levied against its income for the year 1949 by the inclusion therein of the three items above set out, his conclusion being, as contended by plaintiff and above referred to, that even though what he terms the corporation’s “technical commercial domicile” is in Louisiana, the income from these intangibles under the above jurisprudence could only form a part of the allocable income for income tax purposes where the intangibles have been so used in connection with the corporation’s business here as to have become an integral part thereof, and, thus, to have acquired also in Louisiana what he terms a “substantial business situs.”
 

 
 *517
 
 The learned trial judge is in error in this conclusion, as the above jurisprudence— and particularly the quoted comments — reflects. Furthermore, the provisions under which the Collector of Revenue in computing the income tax due by the plaintiff corporation for 1949 included these items, clearly recognizes the two separate and distinct exceptions to the general domiciliary rule under the mobilia maxim, and authorizes the inclusion of income from intangibles in the computation of allocable income from Louisiana sources under either the “business situs” or the “commercial domicile” theory, as R.S. 47:241 and 243 readily disclose.
 

 R.S. 47:241 provides that the net income of a non-resident individual or a foreign corporation subject to the imposition of the income tax provided for in that chapter “shall be the sum of the net allocable income earned within or derived from sources within this state, as defined in R.S. 47:243 * * *.” The pertinent portions of this latter section provide that “Items of gross allocable income shall be allocated directly to the states from which such items of income are derived, on the following bases: * * * (2) Interest on customers’ notes and accounts shall be allocated to the state in which customers are located. (3) Other interests, dividends, and profits from sales and exchanges of capital assets consisting of incorporeal property or rights, shall be allocated to the state in which the securities or credits producing such income have their situs,
 
 which shall be at the business situs of such securities or credits,
 
 if they have been so used in connection with the taxpayer’s business as to acquire a business situs,
 
 or, in the absence of such a business situs,
 
 shall be at the legal domicile of the taxpayer in the case of an individual or
 
 at the commercial domicile of the taxpayer in the case of a corporation *
 
 * (The emphasis has been supplied.)
 

 Thus it may be seen from these provisions that the legislature has provided in clear and unambiguous language that whether the taxpayer is a nonresident individual or a foreign corporation, the only portion of the income derived from intangibles that are allocated to other states are: (1) Interest received in connection with “notes and accounts” of customers located in other states, which is to be allocated to the respective states where these customers are located, and (2) interest (other than that derived from the notes and accounts of foreign customers), dividends, and profits from sales and exchanges of capital assets consisting of incorporeal property or rights where the securities and credits producing such income have acquired a situs in another state. In the event the income is derived from such securities or credits, then the allocation is to be (a) to the state where they have acquired a “business situs” and, if they have not acquired a “business situs”
 
 *519
 
 in another state, then (b) to the state of legal domicile if the taxpayer is an individual, and (c) the state of “commercial domicile” if the taxpayer is a corporation.
 

 In other words, under the positive law of this state, the Collector of Revenue is authorized to levy a tax on the income from the intangible assets of both a nonresident individual and a foreign corporation as having been earned within or derived from sources within this state unless it can be shown that such income was derived from (a) interest on the “notes and accounts” of foreign customers, or (b) securities or credits that have been so used by the individual or the corporation -as to have acquired a “business situs” in another state. If the interest is from foreign customers, this income in the case of the nonresident individual and the foreign corporation is allocated to the states where these customers are located. If the income is other interest, dividends, and profits from securities or credits that have acquired a “business situs” in another state, then that income is allocated to the state of “business situs” whether received by a nonresident individual or a foreign corporation. If no such “business situs” has been established in another state under the latter condition, then the income in the case of the individual is allocated to his legal domicile; and in the case of the corporation, is allocated to the state where the corporation has its “commercial domicile,” considered in law, as reflected by the above jurisprudence, to be its actual (rather than its paper or technical) legal domicile.
 

 To say it another way, all of the gross income from the intangible assets of a nonresident individual or a foreign corporation deemed to be earned within or derived from sources within Louisiana is allocated to the legal domicile of the former and the “commercial domicile” of the latter unless (a) it is interest on the notes and accounts of customers located in other states, or (b) other interest, dividends, and profits derived from securities or credits having a “business situs” in another state, in which events, the gross income from such source is allocated to these respective states.
 

 This allocation is not only reasonable and fair, but also sound, and its application does not give rise to any indication of arbitrariness or discrimination. It therefore follows that inasmuch as the plaintiff corporation does not claim the items of income involved in this case are either interest on customers “notes and accounts” or have been derived from credits or securities used in connection with its business in another state in such a manner as to have there acquired a “business situs,” the Collector of Revenue correctly included them in computing the income tax due the state by the plaintiff corporation in 1949 if it is established the corporation’s “commercial domicile” was in Louisiana during that year.
 

 
 *521
 
 According to the facts of this case, as will be hereafter developed, it is clear that the commercial practices of the United Gas Corporation were so localized in 1949, and, indeed, during many years immediately pri- or thereto, that Louisiana was the one place in the United States that could be characterized not only as the geographical center and control of its operations, but also the focal point from which its management functioned in all of its phases. In fact, this case furnishes an excellent example of the manner in which the threads of holding companies, subholding companies, operating subsidiaries, affiliates, and interlocking officers and directorates served to draw about the management and corporate functions of each as a separate entity draperies meshed of such an impenetrable and tangled mass of intricate manipulations and devices as to require the courts to look into the “realities” of the facts of each case, resulting not only in the development of the “commercial domicile” exception to the mobilia rule as originally applied to the intangible assets of such legal entities, but also making imperative the enactment of the Public Utility Holding Company Act of 1935 (Aug. 26, 1935, c. 687, 49 Stat. 803, 15 U.S.C.A. 482-641, § 79) to correct the grave evils and abuses Congress found to exist where the holding company device was used in the country’s electric and gas utlility industries.
 
 [12]
 

 
 *523
 
 The record (as well as briefs) in this case, involving a serious problem in corporate structure and management for income tax purposes, is so far from complete in many aspects as to be unnecessarily vague, requiring a great deal of independent research on the part of the court in order that we might have a comprehensive picture of the pertinent facts and law necessary for a determinative conclusion in the matter.
 

 This research reveals that what might be termed the actual origin of the United Gas Corporation lay in the mind of Sidney Z. Mitchell who, from the organization of the Electric Bond and Share Company under the laws of New York on February 27,
 
 1905, by the
 
 General Electric Company, ■until he retired in 1933, was either vice-president and director, president, or chairman of the board not only of this company but, at one time or another, of most, if not all, of its subholding companies and •subsidiaries. In forming this new company by turning over to it cash and miscellaneous securities valued in excess of $5,000,-000 and receiving in return all of its common and preferred stock, General Electric apparently hoped through this channel to realize as much as possible from the various utility securities it had acquired in selling its equipment, to obtain a proprietary ■stake in a promising young industry with which it was closely affiliated, and to advance the future sale of its products and equipment.
 

 In. December of 1924, the board of directors of General Electric voted to “divorce itself” from Electric Bond and Share ■ — because a Congressional directive issued that month ordered the Federal Trade Commission to investigate the undue control General Electric exercised over the electric power industry, including production, generation, and transmission of electricity — and, in January following, General Electric disposed of its investmént in Electric Bond and Share by forming the Electric Bond and Share
 
 Securities
 
 Corporation,
 
 to
 
 which, on January 20, 1925, it transferred its entire holdings in the securities of Electric Bond and Share in exchange for all of the capital stock of the new company, and then declaring it out as dividends to its stockholders, thus
 
 ostensibly
 
 placing the control of Electric Bond and Share in the hands of the new
 
 securities
 
 corporation although all officers and directors of the new corporation during its rather short life were officers and directors of Electric Bond and Share or associated with its counsel. Subsequently, on March 13, 1929, Electric Bond and Share
 
 Securities
 
 Corporation was consoli
 
 *525
 
 dated and merged with Electric Bond and Share Company to form the new Electric Bond and Share Company that played such a large part in the incorporation of the United Gas Corporation in March of 1930, as well as in its subsequent history.
 

 In the meanwhile, Sidney Z. Mitchell, vice-president and a director of Electric Bond and Share Company in 1905, seems to have conceived from the very inception of this company the potentialities of the subholding company device as an instrumentality through which it could exercise control over vast utility systems with a minimum, or no actual, investment,
 
 [13]
 
 as the first of a number of such subholding companies, American Gas and Electric Company
 
 [14]
 
 was organized the very next year.
 
 [15]
 
 Electric Bond and Share Company not only controlled these subholding corn
 
 *527
 
 pañíes, but, through them, their subsidiary-operating organizations, with the result that it eventually constituted the largest single public utility holding company in the nation required to register under the Public Utility Holding Company Act of 1935.
 

 The structure of the system seemed simple, with Electric Bond and Share on the first, or top level; the subholding companies on the second, or intermediary level; and the operating subsidiaries on the third, or base level, on which level there existed, by 1942, some 237 direct and indirect subsidiaries of the intermediate sub-holding companies. However, the system was interlaced with complexities for on each of the major corporate units at the base of the system were superimposed one or more holding companies with complex structures of their own. The United Gas Corporation as originally formed in 1930 furnishes an excellent example of the complexities in the major corporate units at the base of Electric Bond and Share’s pyramided holding company device, as will be later developed.
 

 It appears that the original subholding company, American Gas and Electric Company, was permitted to retain a semblance of an operating and management staff of its own, primarily because Electric Bond and Share had not then developed its own service, management, and operating staff. However, beginning in 1907, Electric Bond and Share gradually took over the management of the subholding companies and their subsidiaries until, in 1917, as the number of associates increased and the management staffs were perfected, all employees of the subholding companies (with the possible exception of the first one formed in 1906) were dispensed with and the books and records of these companies turned over to employees of Electric Bond and Share, all of their officers being paid exclusively by it and all activities performed for and in the name of these companies and their subsidiaries being performed by the employees of Electric Bond and Share Company. In other words, Electric Bond and Share employees “officered” the subholding companies, formed more than a majority of its boards, and managed them. In this phase, the subholding companies were nothing more than sets of books kept at the office of Electric Bond and Share in New York City, performing no real or useful functions with respect to their operating subsidiaries (that represented an amalgam of smaller units), and to whom the sub-holding companies were mere abstractions, with Electric Bond and Share standing in loco parentis.
 

 
 *529
 
 This new arrangement was formalized by the execution of what were termed “service” contracts, entered into between Electric Bond and Share and each of its subholding and operating companies, such companies paying a fee for services rendered through various departments of Electric Bond and Share that covered every ramification of public utility activities — such as engineering, construction, financial, purchasing, budget, insurance, statistical, tax, sales, secretarial, legal, treasury, and corporate— and from which Electric Bond and Share not only realized substantial profits, since its fees were based on a percentage of the gross revenues of these companies, but also through which it, in addition to voting rights in the common stock, controlled them.
 
 [16]
 

 This situation continued until 1935 when, just before the Public Utilities Holding Company Act — designed, as above pointed out, to strike down the evils that permitted this top holding company to hide in its subholding company books the financial condition of all of the public utility companies in the system from the scrutiny of governmental agencies, investors, and consumers, as well as prevent the employment by the top holding company of unsound policies and intrasystem transactions beneficial to it and its subholding companies at the expense of the operating companies and those investing in these . companies— went into effect, in an effort to maintain an ostensible position as an “investment” and not a public utility holding company, and thus place itself beyond reach of the provisions of the act that required such companies to register and make full disclosure of their corporate structure and financial condition, Electric Bond and Share, in November of 1935, organized a wholly-owned service corporation known as Ebasco Services, Incorporated, to which it transferred all of its assets previously used in connection with its servicing activities, including the capital stock in the corporation it had formed in 1925 to purchase and operate a building at No. 2 Rector Street in New York City where the head office of Electric Bond and Share, with all of its managing and servicing departments, was housed. To this new corporation Electric Bond and Share assigned all of its service contracts in so far as they dealt with the
 
 operating
 
 companies in the system
 

 In connection with the further over-all system changes that took place then, Electric Bond and Share, for the first time, gave to each of the subholding companies (of which United Gas Corporation was apparently one), a full complement of officers and employees, and assigned to each a
 
 *531
 
 ■separate suite of offices in the building at .No. 2 Rector Street.
 
 It cancelled its service contracts with these subholding companies,
 
 and both Electric Bond and Share and the subholding companies acquired their own service personnel. (See note at
 
 7
 
 SEC 1059.) Furthermore,
 
 these contracts were not assigned to Ebasco Services, Inc.
 
 At about the same time, the formal interlocking that had previously existed between boards of directors of Electric Bond and Share and the subholding companies and their subsidiaries, were substantially terminated. So far as we can determine, the service contract Electric Bond and Share had with the United Gas Corporation as a subholding company was one of those then cancelled and not assigned to Ebasco Services, Inc. It would appear, therefore, that United Gas Corporation from 1935 to the time involved in the instant litigation, was never “serviced” by either Electric Bond and Share or Ebasco Services, Inc., and thus not managed or controlled by the top holding company through this device.
 
 [17]
 

 This maneuver proved to be fruitless, however, for by resort to an injunction suit against Electric Bond and Share Company •and five of its immediate subholding companies (including the United Gas Corporation) to prevent their use of the channels of interstate commerce in the furtherance of their operations, instituted by the Securities and Exchange Commission, in which suit sixteen other holding companies in the system were permitted to intervene, it was held that Electric Bond and Share and the other companies, with certain exceptions (among which was not included United Gas Corporation when the decision in the lower federal court was rendered), were “holding companies” within the meaning of the act, and, as such, required to register and comply with its provisions. See, Securities and Exchange Commission v. Electric Bond & Share Co., D.C., 18 F.Supp. 131, affirmed by the circuit court at 92 F.2d 580, and, finally, by the United States Supreme Court in March of 1938—303 U.S. 419, 58 S.Ct. 678, 82 L.Ed. 936, 937. From March 1938, therefore, Electric Bond and Share and all of its subholding companies and their subsidiaries were, with respect to corporate structure, financing, and all other matters covered by the act, under the actual jurisdiction of the Securities and Exchange Commission, and all policies with respect
 
 *533
 
 thereto were subject to the Commission’s careful scrutiny and approval.
 
 [18]
 

 As pointed out above, among the five sub-holding companies against which this suit was originally instituted was the United Gas Corporation, and, additionally, the Electric Power & Light Corporation, the former being the corporation with which we are immediately concerned in this case, and the latter playing an important part in its history. Of the sixteen holding companies permitted to intervene in the suit, seven were exempt from the act by rulings of the Commission, two ceased to be holding companies prior to the decision in the federal district court “by reason of their acquisition of all of the properties of their subsidiaries,” and
 
 five others ceased to be holding companies
 
 following rendition of the decree in the district court on January 29, 1937, with three of which we are particularly concerned in this case, i. e., the-United Gas Corporation and two of its subsidiaries, the United Gas Public Service Company and the Houston Gulf Gas Company. See, Footnote No. 2 in the decision of the United States Supreme Court at page 680 of 58 S.Ct., at page 940 of 82 L.Ed.
 

 Reverting now to 1925, on January 20th of which year General Electric “divorced” itself from Electric Bond and Share, it is to be noted that almost immediately thereafter, in March, ‘Electric Bond and Share organized under the laws of Maine the Electric Power & Light Corporation. The largest and most polished venture in its holding company structure up until that time, this company was originally designed to take over the assets and/or securities of two subholding companies of Electric Bond and Share that controlled some six oper
 
 *535
 
 ating electric and railway companies (among which was the New Orleans Public Service, Inc.). For some time prior thereto, however, Sidney Z. Mitchell had been negotiating with Harvey C. Couch of Arkansas, president of the Southern Power & Light Company, a holding company controlling a number of electric utilities in Arkansas, Louisiana, and Mississippi, and, approximately a month after its organization, Electric Power & Light Corporation acquired these additional properties as the nucleus for the formation of three electric utility companies in these states.
 
 [19]
 

 About a year later, in October of 1926, Electric Power & Light Corporation acquired control of a holding company by the name of Gas and By-Products Company, which, in turn, owned the controlling stock in some six companies engaged in the production, transportation, distribution, and sale of natural gas in various parts of Louisiana and Texas.
 
 [20]
 
 This was Electric Bond and Share’s first venture into the natural gas field, and probably stemmed from Mitchell’s association with Couch in the acquisition of the Couch electric utility interests, for Couch, at that time, had already acquired an interest in the large Monroe gas field in Louisiana and undertaken the construction there of a steam electric station that would employ natural gas as fuel. See, 11 SEC 1185, particularly Note No. 93.
 

 There was at this time, or at least produced during the years immediately subsequent thereto, a large supply of natural gas in the Monroe and Richland fields of Louisiana for which there was no market (particularly in the former field), and, in February of 1928, a syndicate composed of some four or five companies that controlled large acreages in this field organized under the laws of Delaware the Mississippi River Fuel Corporation (authorized to do business in Louisiana on February 1, 1929) to construct a 22-inch natural gas transmission pipeline from a point in Louisiana known as Perryville, near the Monroe Gas Field, some 500 miles through Louisiana, Arkansas, Missouri, and on into Illinois, for the express purpose of disposing of this available gas for which there was no market through its sale by these companies to this new corporation. As pointed out by the Federal Power Commission in a decision involving an investigation of the gas
 
 *537
 
 rates charged by the Mississippi River Fuel Corporation rendered November 9, 1945, “Mississippi River Fuel Corporation was organized in 1928 by several companies which controlled gas acreage in the Monroe and Richlapd Fields in Louisiana for the purpose of providing a market in St. Louis for that available natural gas. In the early days the gas was chiefly sold by Mississippi for industrial purposes, but distribution company customers were subsequently acquired. * * * After 1935, Mississippi had outstanding $6,552,200 in common stock and built up a substantial surplus. * * *
 
 The capital stock of Mississippi is owned,
 
 except for a relatively few shares,
 
 by
 
 Standard Oil Company (New Jersey),
 
 United Gas Corporation,
 
 United Carbon Company, and Columbian Carbon Company.
 
 It has been controlled and managed since its inception by its original incorporators, or their successors in interest, which also have supplied directly or through affiliates all of the company’s gas requirements.”
 
 63 PUR (NS) 89. The plaintiff apparently concedes this, for during the testimony its officers referred to the United Gas Corporation as one of the “partners” owning and controlling the Mississippi River Fuel Corporation. Of these four, the plaintiff apparently owned by far the greater share of the stock — 46.65'%—of this corporation, the profit derived from the sale of which in 1949 forms the basis for the largest portion of the additional assessment made against it by the Louisiana Collector of Revenue that is involved in this litigation. (The emphasis has been supplied.)
 

 Three of the companies forming the original syndicate were the Standard Oil Company of New Jersey, Columbian Carbon Company, and United Carbon Company. The others were either the Electric Power & Light Corporation, its wholly-owned subsidiary Gas and By-Products, the Palmer Corporation of Louisiana,
 
 [21]
 
 or the Magnolia Petroleum Company. At any rate, by the time the pipeline was completed and put into operation in November of 1929, Louisiana Gas and Fuel Company had been, on April 8, 1929, organized under the laws of Florida as a wholly-owned subsidiary of Electric Power & Light Corporation (apparently to keep its electric and gas utility holdings separate), and there was vested in this new company not only all of the interests Electric secured in 1926 with the acquisition of Gas and By-Products Company, but also the controlling interest in the Palmer Corpora
 
 *539
 
 tion of Louisiana and its subsidiaries,
 
 [22]
 
 and whatever interests these organizations had in the Monroe and Richland gas fields were thus owned entirely or controlled by Electric Power & Light Corporation through its Louisiana Gas and Fuel Company, Electric Power & Light Corporation appearing in Moody’s public utility reports for' the year 1930 as the fourth partner in the syndicate. By 1938 United Gas Corporation was the fourth partner, it having acquired all of these interests, plus the interests Electric Power & Light Corporation acquired in 1930 through the merger of the United Gas Company with the United Gas Corporation, created that year, as will be hereafter pointed out, most, if not all, of which had apparently been secured by United Gas Company through its purchase, just prior to the merger, of certain natural gas properties of the Magnolia Petroleum Company (a wholly-owned subsidiary of Standard Oil Company of New York) and two of its subsidiaries.
 

 Thus the Mississippi River Fuel Corporation at the time of its formation, and thereafter, owned no production property but was “engaged in the business of purchasing natural gas in the natural gas fields located within the state of Louisiana” (34 PUR [NS] 8) from the producers responsible far its creation, they apparently agreeing among themselves the percentages of Mississippi’s total peak daily and annual gas requirements each would supply, these being formalized by contracts. The quota assigned to the interests owned and held by the United Gas Corporation under a contract expiring in 1952, and, from its creation in 1937, supplied by its wholly-owned subsidiary United Gas Pipe Line Company, was 40%. However, this pipeline company, under a contract executed September 7, 1945, and expiring in 1966, not only took over in 1947 the contract of United Carbon Company (from which year it found itself unable to furnish this supply), that had been furnishing 17% of Mississippi’s gas requirements, but also bound itself to
 
 “furnish any increased share up to all of” Mississippi's entire requirements,
 
 it constituting such an important part of plaintiff’s business that this pipeline subsidiary was characterized as the “principal supplier” of all of the gas purchased by Mississippi for resale to domestic, commercial, and industrial consumers. There is no showing that the dividends derived from the stock it thus owned in the Mississippi River Fuel Corporation or the profit plaintiff realized from the sale to this corporation of its natural gas in these Louisiana fields was ever kept separated from all of the other funds of the plaintiff corporation, and in banks outside the state
 
 *541
 
 of Louisiana, these funds apparently being commingled with all of the other funds of the corporation and “plowed” back into the regular operations of the company. See, 34 PUR (NS) 8; 48 PUR (NS) 91; 63 PUR (NS) 89; 65 PUR (NS) 184; Mississippi River Fuel Corp. v. Federal Power Commission, 3 Cir., 202 F.2d 899; Moody’s Public Utilities for the years 1928 through 1949; and the annual reports of the United Gas Corporation covering the years 1944 through 1949. (The emphasis has been supplied.)
 

 The principal office of the Palmer Corporation of Louisiana at the time Louisiana Gas and Fuel Company acquired the controlling interest therein in 1929 was at Shreveport, Louisiana. Its vice-president was Mr. N. C. McGowen, who had always lived in Shreveport, and had been with the Potter Palmer properties since 1912 or 1913, around the time Palmer apparently began explorations for the production of natural resources in the South. Mr. McGowen was made the president of the new Louisiana Gas and Fuel Company when it was formed in 1929 and also a director of the Mississippi River Fuel Corporation. He was still a director of the Mississippi River Fuel Corporation when United Gas Corporation, in 1949, sold its stock therein, having resigned along with another director who was also a director of the United Gas Corporation and a vice-president, as well as president of Electric Power & Light Company, only a few days prior to the consummation of this sale.
 

 Subsequent to the formation of the Mississippi River Fuel Corporation, there was formed under the laws of Delaware on May 22, 1928, the United Gas Company for the purpose of controlling through operating subsidiaries a large number of complete and unified systems (comprising what are referred to in the evidence as the MoodySeagraves interests) for the production, transmission, and sale of gas in Texas and Louisiana, commonly known as The United Gas System. After the incorporation of the Louisiana Gas and Fuel Company and just prior to the incorporation of the United Gas Corporation, Electric Bond and Share advanced to United Gas Company, a non-affiliate, through a nominee, the sum of $55,000,000 in order that the United Gas Company might acquire certain natural properties of the Magnolia Petroleum Company, and two of Magnolia’s subsidiaries.
 
 [23]
 

 The United Gas Corporation was organized in the usual Electric Bond and Share pattern in March of 1930 under the laws of Delaware as an intermediate subholding company but subsidiary of Electric Power & Light Corporation for the purpose of
 
 *543
 
 consolidating in this one corporation all of the interests then held by the Louisiana Gas and Fuel Company and the United Gas Company, which comprise the thirty-five to forty-five separate and smaller companies referred to in the testimony as the Palmer, Moody-Seagraves, and Gas and By-Products properties that were the predecessors of the United Gas Corporation,
 
 [24]
 
 the interests acquired through the United Gas Company bfeing by far the most extensive. As a result of this consolidation the new company acquired not only 20% of the capital stock of the Mississippi River Fuel Corporation through United Gas Company— which, together with the amount it formerly acquired when the corporation was formed, vested it with an amount in excess of 46% of the capital stock of the corporation — -but, by June of 1930, when the corporation became operative, had also acquired control of the Northern Texas Utilities Company. It had, additionally, assumed the obligation of repaying Electric Bond and Share’s loan of $55,000,000 advanced the United Gas Company for the purchase of the Magnolia gas interests. All of the securities held by the Louisiana Gas and Fuel Company were turned over to the new corporation (United Gas Corporation), with which it was merged, the fuel company’s authorization to do business in Louisiana being withdrawn January 15, 1932.
 

 The interests thus pooled in the United Gas Corporation as the subholding company of Electric Bond and Share and subsidiary of Electric Power & Light Corporation
 
 were engaged principally in the production,
 
 purchase, gathering, transportation, distribution,
 
 and sale of natural gas,
 
 but, additionally, in the production and sale of crude oil, the extraction and sale of natural gasoline and other liquid hydrocarbons from natural gas, and the production and sale of sulphur, although the portion dealing with the natural gas business was by far the larger part of the operations of the corporation. Each of the active operating companies in which it held a controlling interest or owned outright had a comprehensive complement of skilled personnel under which it was operating when acquired, and its operations as a whole extended throughout parts of Texas, Louisiana, Mississippi, Alabama, and Florida.
 

 
 *545
 
 In July of 1930 the United Pipe Line Corporation was formed under the laws of Delaware as the principal operating subsidiary of the United Gas Corporation, and to it was transferred all of the interests of the United Gas Corporation, these properties being owned directly by the United Pipe Line Corporation and operated as a unit from administrative offices in Houston, Texas, that were apparently the former headquarters of the Moody-Seagraves interests held in the United Gas Company. In January of 1931, the name of this corporation was changed to the United Gas Public Service Company, but, from the beginning, Mr. N. C. McGowen, still residing in Shreveport and formerly president of the Louisiana Gas and Fuel Company, that held all of the natural gas interests owned by Electric Power & Light Corporation, was president of this new operating corporation, as well as a director, commuting to and from Shreveport and Houston in the performance of his duties of managing and supervising the corporation’s operating activities. He was, further, a director of the United Gas Corporation. As Mr. Mc-Gowen put it in answer to interrogatories propounded to him,
 
 “I operated and managed the operating subsidiaries of United Gas from its organization in 1930,”
 
 United Gas Corporation being nothing more than the subholding company of Electric Bond and Share on whose books was apparently carried only the stock of this new operating company, as all of these interests were actually vested in and owned by the United Gas Public Service Company during this period. And despite its full complement of skilled personnel, this corporation was apparently required to subscribe to the “services” furnished by Electric Bond and Share until just prior to the effective date of the Public Utilities Holding Company Act of 1935. (The emphasis has been supplied.)
 

 During the years immediately succeeding, the first steps were taken by the United Gas Public Service Company to simplify its corporate structure, in the process of which it acquired all of the assets and assumed all of the remaining obligations of the Palmer Corporation of Louisiana and its subsidiaries, and also of some of the companies it had acquired control of through United Gas Company, with the view, apparently, of eventually dividing its principal operations into three broad fields, i. e., the production, transmission, and sale of natural gas.
 

 Thus, from its creation in 1925 until 1935, Electric Power & Light Corporation was nothing more than a set of books in the hands of Electric Bond and Share, as was United Gas Corporation from its creation in 1930 until 1935. In the latter year, as above pointed out, each of these subholding companies was given a complement of officers and employees, assigned a separate suite of offices in the building at No. 2
 
 *547
 
 Rector Street in New York, their service contracts with Electric Bond and Share cancelled, and the formal interlocking that had previously existed between the boards of directors of Electric Bond and Share and its subholding companies and their subsidiaries was substantially terminated, although as between Electric Power & Light and United Gas Corporation it was evidently continued. So far as we can determine, neither Electric Power & Light Corporation nor United Gas Corporation was ever authorized to do business in New York, and this seems to be conceded by the plaintiff. It is also apparently conceded, at least in oral argument, that the three items of income derived from the intangible interests of United Gas Corporation in 1949 that form the basis of this suit have not been taxed by either Delaware or New York, or any other state.
 

 Following rendition on January 29, 1937, of the decree by the federal district court in the injunction suit against Electric Bond and Share and its subholding companies, which found United Gas Corporation to be a “holding company” within the meaning of the act, and, as such, required to register with the Securities and Exchange Commission and make full disclosure of its corporate structure and financial condition, including that of all of its subsidiary operating and holding companies, and while the case was pending on appeal before the Second Circuit Court of Appeals, drastic steps were immediately taken (in an apparent effort to place United Gas Corporation out of the “holding company” class as defined under the act) that resulted in a complex reorganization and redistribution of the properties in the United Gas System, as it was then called, after the old United Gas Company.
 

 Briefly, it might be stated that all of the properties then in the system and owned directly by the United Gas Public Service Company as the operating arm of the United Gas Corporation dealing with the production of gas and oil, including undeveloped leases, were placed in the wholly-owned subsidiary Union Producing Company, and all of the field gathering lines, main pipelines, compressor stations, and natural gasoline plants of the United Gas Public Service Company and its subsidiaries were placed in the wholly-owned subsidiary United Gas Pipe Line Company, formed on September 3, 1937, as a Delaware corporation. The only properties in the system in these categories not transferred to the producing and pipeline subsidiaries were those held by the Houston Gulf Gas Company and its then subsidiaries dealing with the wholesale distribution of gas (this holding company liquidated or merged into United Gas Public Service Company all of its properties engaged in the retail sale of natural gas, such as, for example, the Houston Gas and Fuel Company, Southern Gas Utilities, Inc., and Northern Texas Utilities Company, and
 
 *549
 
 retained only those properties that were engaged in the wholesale distribution of natural gas, which would place it beyond the reach of the act of 1935), and Cia Mexicana de Gas, S. A., a Mexican corporation 99.9% of the ownership of which was vested in the United Gas Public Service Company, and which was eventually sold. Following this, in November of 1937, United Gas Public Service Company was merged into the United Gas Corporation. It was for these reasons that the United States Supreme Court in its decision rendered in March of 1938 in the injunction suit against Electric Bond and Share and its subholding companies pointed out in a footnote that subsequent to the decision in the district court, United Gas Corporation, United Gas Public Service Company, and Houston Gulf Gas Company had ceased to be “holding companies” within the meaning of the act.
 

 As% result of these intrasystem transactions, United Gas Corporation then
 
 owned and operated itself all of the retail distribution properties
 
 formerly owned and operated by the subsidiaries, as well as a distributing system located in Monroe in which United Gas Public Service Company and interests not affiliated with it had theretofore been jointly interested. Its wholly-owned subsidiary, Union Producing Company, had under its control and operation all of the leases and producing properties in the system, and its wholly-owned subsidiary United Gas Pipe Line Company had under its control and operation all of the gathering and transmission properties of the system, as well as the compressor stations and natural gasoline .plants. Excepted only were those of the Houston Gulf Gas Company, then apparently engaged only in the
 
 wholesale
 
 distribution of natural gas, and the Mexican corporation. Mr. N. C. Mc-Gowen was not only president of the Houston Gulf Gas Company and its subsidiaries, but apparently also of the producing and pipeline companies. On July 16, 1937, United Gas Corporation secured permission to do business in Louisiana, and on September 9, 1937, the production and pipeline subsidiaries secured like permission. By 1939 there was under construction in Shreveport, Louisiana, by the pipeline corporation, a building known as “The United Gas Building,” which was occupied in February of 1940 and from which all of the corporation’s activities were managed, with the exception of those held by the Houston Gulf Gas Company, and, possibly, the foreign corporation, which were kept separate, the Houston company still maintaining offices in Houston, Texas.
 

 Following the decision of the United States Supreme Court in March of 1938 that ordered registration of Electric Bond and Share and Electric Power & Light Corporation (along with other subholding companies) with the Securities and Exchange Commission as public utility holding companies, and thus opened the books of this
 
 *551
 
 holding company system to the scrutiny of the Commission, the stockholders, and the public, the Commission, on February 28, 1940, ordered a hearing to determine whether Electric Bond and Share and its subsidiary companies should be required to limit their operations to
 
 a single public utility system,
 
 i. e., either electric or gas, and the extent to which any of these companies would be permitted to control additional integrated systems or to retain interests in other businesses. See, 7 SEC 124. It is interesting to note that in an attempt to resist this hearing, Electric Bond and Share and its subholding companies (including Electric Power and Light Corporation) contended they were “separate corporate entities,
 
 zvith principal offices in various
 
 states.” See, 7 SEC 198. Further, on May 9, 1940, the Commission ordered a hearing to determine whether the various subholding companies of Electric Bond and Share
 
 should be dis
 
 solved,, including Electric Power & Light Corporation. See, 7 SEC 391. (The emphasis has been supplied.)
 

 In August of 1942, the Commission, in a lengthy report in which the entire history of the formation, corporate structure, and financial condition of the subholding companies there involved- — of which Electric Power & Light Corporation was one — was reviewed and analyzed,
 
 ordered the liquidation of this corporation on
 
 the ground it unduly and unnecessarily complicated the Electric Bond and Share holding company system, with the result that the voting power was unfairly and/or inequitably distributed among the security holders of the system since control lay in the common stock, which was “under water.” In its report the Commission also pointed out that Electric Power & Light Corporation
 
 performed no useful
 
 function,
 
 either corporate or financial
 
 (other than, perhaps, to drain from its operating subsidiaries large sums for the payment of the salaries of the officers purportedly managing Electric’s affairs), and, indeed, had created so many problems for its subsidiaries remedies must be found to restore these companies to a condition of soundness in the interest of their security holders and the consuming public, United Gas Corporation being mentioned in particular. See, 11 SEC 1146— 1239. This recommendation was approved by the federal courts, and the final decision in the matter was handed down by the United States Supreme Court in November of 1946. See, American Power & Light. Co. v. Securities and Exchange Commission, 329 U.S. 90, 67 S.Ct. 133, 91 L.Ed. 103.
 

 In the meanwhile, in an effort to simplify its corporate structure further and remedy its unsound condition — top-heavy with debt and in a precarious condition, particularly with respect to the repayment to Electric Bond and Share of the $55,000,000 it originally loaned United Gas Company for acquisition of the gas interests of Magnolia and two of its subsidiaries, and which
 
 *553
 
 United Gas Corporation assumed with the ■merger of the two corporations in 1930, as well as almost $80,000,000 in dividends on preferred stock that was due but which the corporation was unable to pay, particularly to its immediate parent, Electric Power & Light Corporation — United Gas Corporation, acting in its own behalf and without the concurrence of Electric Bond and Share or Electric Power & Light Corporation applied to the Commission for several proposals (12 SEC 442, 14 SEC 308), and, finally, in connection with an investigation into its organization and financing, voluntarily submitted a plan for its
 
 reorganisation and refinancing
 
 in an effort to avert the danger of being placed in receivership and
 
 so that it might begin life anew
 
 in a sound position from a financial as well as an organizational standpoint. This plan, after several changes were made upon the recommendation and at the request of the Commission, was finally approved by the Commission and by the federal court. See, 16 SEC 80, 531; In re United Gas Corporation, D.C., 58 F.Supp. 501, handed down November 20, 1944. Another reason that made such a plan imperative was the fact that there were then pending some thirteen suits by various groups of stockholders against both Electric Power & Light Corporation and United Gas Corporation with respect to claims and equities assertedly growing out of the manner in which the affairs of the United Gas Corporation had allegedly been managed by Electric Bond and Share and Electric Power & Light Corporation.
 
 [25]
 
 Pending final culmination of the plan, the Commission took over exclusive jurisdiction of all of the assets of the United Gas Corporation.
 

 Briefly stated, the action contemplated the elimination from the security structure of all of the obligations and outstanding stock of the United Gas Corporation. Electric Bond and Share was held responsible for the form and nature of the organization of United Gas Corporation and its subsequent history and top-heavy capitalization, as well as its lack of equity and working capital, which necessitated the borrowings that made up Electric Bond and Share’s large debt claim, a portion of which it was required to write-off with a loss of $11,-000,000.
 
 [26]
 
 Electric Bond and Share was also ordered
 
 to divest itself of all
 
 claims against and
 
 interest in United Gas Corporation.
 
 As pointed out at 58 F.Supp. at page 509, while the reorganization would vest in Electric Power & Light Corporation the voting control (approximately 95% of the
 
 *555
 
 new issue of common stock), “that control will eventually find itself in the hands of the public, for
 
 it has been determined that Electric will, in compliance with the act, dissolve.”
 
 As part of this plan, the remaining interests held by Houston Gulf Gas Company and not already merged into United Gas Corporation through the United Gas Public Service Company in 1937, or during the intervening years, were taken over by the corporation early in 1944, particularly by the pipeline subsidiary, the Houston Gulf Gas Company, under approval of the Commission, being merged into United Gas Corporation. See, 15 SEC 891, handed down April 27, 1944. (The emphasis has been supplied.)
 
 [27]
 

 In the middle of this reorganization and before the proposed plan was finally approved by the courts, the then president of the United Gas Corporation in New York died during the summer of 1944, and N. C. McGowen was made president. The plan of reorganization was finally consummated in November of 1944 (see, In re United Gas Corporation et al., 3 Cir., 162 F.2d 409), and it was under these conditions that Mc-Gowen — who had actually been operating and managing all of the affairs of the corporation from its creation in 1930, as above pointed out (even before that, it might be said, through the Louisiana Gas and Fuel Company, of which he was president), first through the United Gas Public Service Company, and, upon its liquidation and merger into the plaintiff corporation in 1937, through the Houston Gulf Gas Company, Union Producing Company, and United Pipe Line Company (each of which companies he headed as president), from the building constructed by the pipeline company in Shreveport that was occupied around February 1940; who knew Electric Bond and Share had been ordered to divest itself of all interest in the corporation, that Electric Power & Light Corporation had been ordered liquidated and its securities turned over to the stockholders thereof and/or United Gas Corporation; who knew of all of the suits pending against the corporation and Electric Power & Light Corporation by the stockholders arising out of the manner in which the former’s affairs had been managed — went to New York early in 1945 and secured all of the books, records, portfolios of securities in the corporation’s subsidiaries, as well as the portfolios holding the securities of the companies in which it held investments in the furtherance of its interests,
 
 including the Mississippi River Fuel Corporation,
 
 and any and all other material pertaining to the United Gas Corporation. McGowen moved all of this into the United Gas Building in Shreveport, Louisiana, where it was kept together with all of the other records and
 
 *557
 
 books and equipment of the corporation and its subsidiaries already there, and where it has been kept and maintained ever since, with the exception of the portfolios of securities, that were placed in bank vaults in Shreveport for safekeeping. From that time only a semblance of an office was maintained in the old Electric Bond and Share Building at No. 2 Rector Street in New York City, with, in addition to the corporation’s vice-president who was president of Electric Power & Light Corporation, possibly one assistant officer or other employee or two. In May and July of 1949, Electric Power & Light Corporation distributed its more than 10,000,000 shares of plaintiff’s stock to its preferred and common stockholders in compliance with the order of the Securities and Exchange Commission. Its interest in the plaintiff corporation ended then.
 

 The record discloses that by 1949 the United Gas Corporation, either itself or through its wholly-owned or controlled subsidiaries directly connected with the production, distribution, and transmission of natural gas, was serving some 369,530 customers — individual, industrial, public utility or distribution and pipeline companies owned by others,
 
 including the Mississippi River Fuel Corporation
 
 — in 420 cities, towns, communities, and rural areas through 16,316 miles of transmission, distributional, and service lines that extended from the International boundary between the United States and Mexico, through Texas to the borders of Oklahoma, and on into Louisiana, Mississippi, Florida, and Alabama, and from which source alone in that year it derived by far the greater part of its income — approximately 65%. A large portion of the gas thus handled, produced, and sold came from 1,007 gas wells, 633 of which the corporation owned outright and in 374 of which it had an interest.
 

 During 1949 the United Gas Corporation further owned either outright or through leases (in addition to the acreages already developed), hundreds of thousands of acres in Texas, Louisiana, Mississippi, and Alabama as potential oil, gas, and mineral properties;
 
 [28]
 
 400 oil wells that it owned outright and an interest in 35 other oil wells, which, together with the gas wells were in some 55 fields scattered throughout Texas, Louisiana, Mississippi, and Oklahoma; plants for the extraction of natural gasoline and other liquid hydrocarbons; cycling plants and compressor stations ; 74.1% of the stock of the Duval Sulphur & Potash Company
 
 [29]
 
 from which it was not only mining sulphur in Texas but be
 
 *559
 
 ginning the mining, processing, and marketing of the substantial reserve of potash discovered in New Mexico by reason of explorations begun in 1947; had subscribed to a 25% interest in the Atlas Processing Company — organized for the purpose of purchasing and operating a refinery at Shreveport, Louisiana, for the reform and upgrading of natural gasoline extracted from its subsidiary pipeline and other companies in their gasoline plants in the Carthage Field in East Texas; had an investment in excess of $2,000,000 in Carthage Hydrocol, Inc., a corporation formed in 1948 for the express purpose of constructing the first commercial-sized plant in the nation to utilize the “Hydrocol Process” for producing gasoline from natural gas, and which was expected to be completed by late 1949; an investment of over $1,000,000 in the Atlantic Gulf Gas Company, another wholly-owned subsidiary organized in 1947 for the purpose of constructing and operating a pipeline system to supply markets in Southern Alabama, Northern Florida, Georgia to the Atlantic Seaboard, and on into South Carolina; together with other investments in excess of $2,000,000.
 

 From the foregoing it is obvious that the focal point of all of the business and operations and management and control of this, corporation and its subsidiaries spread over this wide and vast area of the Southern portion of the United States — not to mention others, such as construction, budget, maintenance, research, public relations, sales promotion, employee relations, issuance of the annual report to stockholders, etc., with which it was necessarily integrated and which therefore formed an important part of its operations — was, in 1949, and for several years prior thereto, actually functioning from the headquarters of the corporation in the large United Gas Building in Shreveport, Louisiana, almost all of its officers, several directors, and a large staff of employees of the corporation and its subsidiaries living in Shreveport and working in this building. There is no question but that substantially all of the corporation’s activities were carried on in Louisiana, or that it was in Louisiana that its actual control was exercised and its management functioned, and that, certainly, more benefits were conferred upon this corporation by Louisiana than by any other state.
 
 [30]
 

 
 *561
 
 Having reached the conclusion that "the income from the intangible assets involved in this case are subject to taxation under the Louisiana income tax law without in any way contravening the due process ■and equal protection guarantees of this state and the United States, or doing violence to the interstate commerce clause of the Federal constitution, we now pass to plaintiff’s alternative plea, i. e., that the in■come from the sale of the Mississippi River Fuel Corporation stock constituted a capital gain as a result of an interstate sale, .and the allocation of the entire gain from such transaction to Louisiana for income tax purposes is a burden on interstate commerce, in violation of Section 8 of Article I ■of the Constitution of the United States.
 

 The authorities relied on by plaintiff do not sustain its position in this respect, as they are not pertinent from a factual or legal standpoint.
 
 [31]
 
 The states have unquestionably surrendered to the Federal government all authority to regulate and control interstate commerce, that right now being vested in the Congress of the United States, and cannot, even under the guise of a tax, enact any law that will interfere with commerce or will impede or place a burden on its flow. However, as pointed out in the .annotation at 67 A.L.R.2d at page 1344, “Interstate commerce and its instrumentalities are not totally immune from state taxation, absent action by Congress. Interstate business must pay its way. It is not the purpose of the commerce clause to relieve those engaged in interstate commerce from their just share of state tax burdens, even though the tax increases the cost of doing interstate business.”
 

 Applying this law to the situation in the instant case, it becomes readily apparent that there can be no serious contention the United Gas Corporation, by removing the stock in the Mississippi River Fuel Corporation from the bank vault in Shreveport and sending it to New York City where there was a more ready market for the disposition of such a substantial block of stock having such a large monetary value, in any way hampered, impeded, or burdened the flow of commerce between the states than would have been the case had an individual Louisiana taxpayer possessed of such stock sent it to New York for sale on the market there because he could in New York, obtain a more ready buyer able to pay the price he felt the stock was worth than he could in Louisiana.
 

 Moreover, as the record clearly establishes, the entire proceeds realized from the sale of this stock were commingled with the funds of the corporation in New York banks, where the stock was sold after re
 
 *563
 
 moval from the Shreveport bank vaults just prior thereto, and from these banks withdrawn and used, together with other funds, for the construction and development expenditures of the corporation during 1949, as well as for the reduction of the funded debt of the corporation.
 
 [32]
 
 Paraphrasing the conclusion of the court in Southern Pacific Co. v. McColgan, supra, the plaintiff owned and held the stock in this corporation (as well as that in other corporations as just above pointed out in giving the holdings and investments of the plaintiff as reflected by its 1949 annual report) to advance the interests of its gas production, transmission, and sales business, the connection between its ownership of the stock in the Mississippi River Fuel Corporation being such that it may be said to have been integrally connected with that business, and, as such, the profit realized from the sale of this capital asset was subject to taxation at the “commercial domicile” of the business,
 
 [33]
 
 the same as the dividends received from such stock in 1949 and the interest paid the plaintiff corporation by the United States government during that year. See, also, Pacific Western Oil Corp. v. Franchise Tax Board, 136 Cal.App.2d 794, 289 P.2d 287, and Sinclair Pipe Line Co. v. State Commission of Revenue and Taxation, 184 Kan. 713, 339 P.2d 341.
 

 For the reasons assigned, the judgment of the district court is annulled and set aside, and the plaintiff’s suit is dismissed at its cost.
 

 HAMITER and SUMMERS, JJ., concur in the decree.
 

 [1]
 

 . The pertinent portions of E.S. 47:243 are as follows: “Items of gross allocable income shall be allocated directly to the states from which such items of income are derived on the following bases: * * (2) Interest on customers’ notes and accounts shall be allocated to the state in which such customers are located. (3)
 
 Other interest, dividends, and profits from sales and exchanges of capital assets consisting of incorporeal property or rights, shall he allocated
 
 to the state in which the securities or credits producing such income have their situs, which shall be at the business situs of such securities or credits, if they have been so used in connection with the taxpayer’s business as to acquire a business situs, or in the absence of such a business situs, shall be at the legal domicile of the taxpayer in the case of an individual or
 
 at the commercial domicile of the taxpayer in the case of a corporation; *
 
 * (The emphasis has been supplied.)
 

 [2]
 

 . In support of these contentions, counsel cite: Penn Mutual Life Ins. Co. v. Board of Assessors, 1912, 131 La. 471, 59 So. 906; Arkansas Fuel Oil Corp. v. Fontenot, 1954, 225 La. 166, 72 So.2d 465; Commissioner of Internal Revenue v. East Coast Oil Co., 5 Cir., 85 F.2d 322, certiorari denied 299 U.S. 608, 57 S. Ct. 234, 81 L.Ed. 449; Compania General, etc. v. C. I. R., 1929, 279 U.S. 306, 49 S.Ct. 304, 73 L.Ed. 704; First Bank Stock Corp. v. State of Minnesota, 1937, 301 U.S. 234, 57 S.Ct. 677, 81 L.Ed. 1061; Newark Fire Ins. Co. v. State Board, 1939, 307 U.S. 313, 616, 59 S.Ct. 918, 83 L.Ed. 1312; Butler Bros. v. McColgan, 1942, 315 U.S. 501, 62 S.Ct. 701, 86 L.Ed. 991; Braniff Airways v. Nebraska State Board, 1954, 347 U.S. 590, 74 S.Ct. 757, 98 L.Ed. 967; Greenough v. Tax Assessors, 1947, 331 U.S. 486, 67 S.Ct. 1400, 91 L.Ed. 1621; Delaware, L. & W. R. Co. v. Commonwealth of Pennsylvania, 1906, 198 U.S. 341, 25 S. Ct. 669, 49 L.Ed. 1077; Hans Rees’ Sons v. State of North Carolina, 1931, 283 U.S. 123, 51 S.Ct. 385, 75 L.Ed. 879; Wheeling Steel Corp. v. Fox, 1936, 298; U.S. 193, 56 S.Ct. 773, 80 L.Ed. 1143; Newport Co. v. Wisconsin Tax Comm., 1935, 219 Wis. 293, 261 N.W. 884, 100 A.L.R. 1204; Ayer & Lord Tie Co. v. Keown, 1906, 122 Ky.
 
 580, 93 S.W. 588;
 
 Chestnut Securities Co. v. Oklahoma Tax Comm., 1935, 173 Okl. 369, 48 P.2d 817; Sinclair Pipe Line Co. v. State Commission of Revenue and Taxation,
 
 1959,
 
 184 Kan. 713, 339 P.2d 341; Uniform.
 
 *497
 
 Stock Transfer Act, R.S. 12:524; 51 Am.Jur. 481-3, inclusive; R.S. 47:31, 47 :42, subd. G, 47:51 and 47:161.
 

 [3]
 

 . As stated in the McCanless case: “Sucb rights are but relationships between persons natural or corporate, which the law recognizes by attaching to them certain sanctions enforceable in courts.
 
 The power of government over them and the protection %ohich it gives them cannot he exerted through control of a physical thing. They can he made effeetive only through control over and protection afforded to those persons whose relationships are the origin of the rights.
 
 Obviously, as sources of actual and potential wealth — which is an appropriate measure of any tax imposed on ownership or its oxercise — they cannot be dissociated from the persons from whose relationships they are derived. These are not in any sense fictions. They are indisputable realities.” (The emphasis has been supplied.)
 

 [4]
 

 . Usually the corporation’s only relationship with the state that gave it birth was to file there its articles of incorporation and maintain a mailing address or agent for purposes of service; in other words, a technical not an actual place of business, its real business being conducted in another state. It would appear the office of the plaintiff corporation in Delaware in the instant case is maintained there through the service of an agency organized for the specific purpose of furnishing this convenience to corporations that use Delaware for purposes of incorporation because of the leniency of its. laws with respect to such entities.
 

 [5]
 

 . State v. Tennessee Coal, Iron & R. Co., 188 Ala. 514, 66 So. 178, 180.
 

 [6]
 

 . The phrase “business situs” as used to support the exception that permits the nondomiciliary state to impose a tax on intangible interest
 
 is said to be “a metaphorical expression of vague signification," that is not susceptible of easy definition, and feio, if any, cases actually attempt to determine the exact elements necessa/iñly implicit in the phrase. The same may be said with respect to “become an integral part" of a business. The conclusion the intangible is taxable under this theory is reached, rather, under the particular facts of the case that are considered sufficient to give it a “business situs” in the foreign state.
 
 For example, a seat on the New York Stock Exchange has been held to have a “business situs” in that state although its owner lived and operated his business in another state, and securities in a testamentary trust have been held to have a situs for tax purposes in a state in which the will was probated and the trust set up and administered. See People of State of New York ex rel. Whitney v. Graves, 299 U.S. 366, 57 S.Ct. 237, 81 L.Ed. 285; Guaranty Trust Co. of New York v. Commonwealth of Virginia, 305 U.S. 19, 59 S.Ct. 1, 83 L.Ed. 16. See, also, Curry v. McCanless, 307 U.S. 357, 59 S.Ct. 900, 83 L.Ed. 1339; “Allocation of Income in State Taxation,” by Altman and Keesling (2d ed.), pages 25, 26, 35, 76, 77, 82 and 83 and the annotation at 143 A.L.R. 361. (The emphasis has been supplied.)
 

 [7]
 

 .For example, in the Whitney case referred to in Footnote No. 6, membership in the New York Stock Exchange, owned by a nonresident who conducted all of his stock brokerage business outside New York, transmitting to other members for execution orders requiring execution upon the exchange floor, was held to have a “business situs” in New York State, thus enabling it, without violence to due process, to impose an income tax upon the profit realized from the sale of a right appurtenant to such membership.
 

 [8]
 

 . But see, Commonwealth v. United Cigarette Machine Co., 119 Va. 447, 89 S.E. 935; United States v. Chin Quong Look, D.C., 52 F. 203; Lau Ow Bew v. United States, 144 U.S. 47, 12 S.Ct. 517, 36 L.Ed. 340; Bov.Law Dict. (15th ed.) 557; 12 C.L 444, Section 24; 15 C.J.S. Conflict of Laws § 6, p. 872, note No. 84.
 

 [9]
 

 . The majority opinion in that ease was distinguished in the later case of Minnesota Tribune Co. v. Commissioner of Taxation, 228 Minn. 452, 37 N.W.2d 737, on the ground the intangibles there sought to be taxed were in no way related to the business of the commercially domiciled corporation conducted within the state, which, under the jurisprudence as pointed out in the dissent and the authorities cited hereinabove, was immaterial.
 

 [10]
 

 . From the foregoing, no useful purpose can be served in discussing the several authorities relied on by plaintiff, as cited above in Footnote No. 2, as they are either inapposite from a legal and factual standpoint, or have been superseded by this later jurisprudence. For example, eight of the cases were decided prior to the Wheeling decision; Ayer & Lord Tie Co. v. Keown did not involve intangibles ; Butler Bros. v. McColgan and Hans Rees’ Sons v. State of North Carolina, involved situations where the “paper” domicile and the “commercial domicile” were one and the same.
 

 [11]
 

 . As pointed out above in Footnote No. 6, and particularly in the annotation in 143 A.L.R. 361, 368, “It is impossible to tell exactly what constitutes the essential and indispensable elements of integration of intangible property with local activity.”
 

 [12]
 

 . The United States Supreme Court in American Power & Light Co. v. Securities and Exchange Commission, 329 U.S. 90, 67 S.Ct. 133, 140, 91 L.Ed. 103, points out that “In the extensive studies which preceded the passage of the Public Utility Holding Company Act, * * it had been found that ‘The most distinctive characteristic, and perhaps the most serious defect of the present form holding-company organization is the pyramided structure which is found in all of the important holding-company groups examined.’ The pyramiding device in its most common form consisted of interposing one or more subholding companies between the holding company and the operating companies and issuing, at each level of the structure, different classes of stock with unequal voting rights. Most of the financing of the various companies in the structure occurred through the sale to the public of bonds and preferred stock having low fixed returns and generally carrying no voice in the managements. Under such circumstances, a relatively small but strategic investment in common stock (without voting privileges) in the higher levels of a pyramided structure often resulted in absolute control of underlying operating companies with assets of hundreds of millions of dollars. A tremendous ‘leverage’ in relation to that stock was thus produced; the earnings of the top holding company were greatly magnified by comparatively small changes in the earnings of the operating companies. The common stock of the top holding company might quickly rise in value and just as quickly fall, making it a natural object for speculation and gambling. In many instances this created financially irresponsible managements and unsound capital structures. Public investors in such stock found themselves the innocent victims, while those who supplied most of the capital through the purchase of bonds and preferred stock likewise suffered in addition to being largely disfranchised. Prudent management of the operating companies became a minor consideration, with pressure being placed on them to sustain the excessive capitalization to the
 
 *523
 
 detriment of their service to consumers. Reduction of rates was firmly resisted. The conclusion was accordingly reached by those making the studies that the higlily pyramided system ‘is dangerous and has no justification for existence’ and ‘represents the holding company system at its worst.’ ”
 

 [13]
 

 .The method by which this was accomplished is explained in great detail in reports and decisions of the Securities Exchange Commission investigating the complex structure of this company, its subholding companies, and all of the operating and holding companies in the lower tiers. See, for example, 11 SEC 650, and 11 SEC 1146. Briefly, Electric Bond and Share would acquire a group of securities representing the controlling interest in operating public utility companies. It would almost immediately form a company and a “syndicate,” the latter composed of itself with a 60% interest and a banking or investment house with a purported 40% interest, such syndicate being managed by Electric Bond and Share as the owner of the majority interest. The syndicate acquired the securities from Electric Bond and Share, transferred them to the new company through an intermediary, and agreed to “underwrite” the sale of that company’s securities to the public to raise large sums of cash, a part of the underwriting agreement insuring participation in the profits expected to be realized by officials of Electric Bond and affiliated interests. The new company paid for these securities, written on its books in an investment account at values far in excess of the original cost to Electric Bond and and Share, by issuing to the intermediary all of its capital stock — preferred and’ common — this, in turn, being handed to Electric Bond and Share as head of the syndicate. Senior securities in the face amount more than sufficient to cover the orginal cost to Electric Bond and Share of the securities it turned over to the syndicate, as well as a block of common stock having a majority total voting power, were issued by the syndicate to Electric Bond and Share and associates in payment of these assets. The “underwritten” cash was raised by marketing the new company’s senior securities, plus a bonus of common stock, for the approximate face amount of the senior security, leaving the syndicate with large amounts of common stock as profit. Electric Bond and Share was given blocks of this stock proportionate to the percentage of its participation in the syndicate and the remainder was distributed among the other participants (officers and directors, etc.) as set out in the “underwriting” agreement. Electric Bond and Share would thus be reimbursed for all costs and expenses in connection with the acquisition of the securities, their transfer to the company, and the operations of the syndicate. In addition, it emerged with a substantial block of voting stock at no cost, as well as complete control of the company and its subsidiaries.
 

 [14]
 

 . See the history of this company as developed In the Matter of American Gas and Electric Company, 9 SEC 247.
 

 [15]
 

 . A few of such subholding companies organized by Electric Bond and Share were: American Power & Light Company (1909, 11 SEC 1146); Utah Securi
 
 *527
 
 ties Corporation (1912); Southwestern Utilities Corp. (1912); Southwestern Power & Light Co. (1912); National Securities Corp. (1914, reorganized in 1919 as Power Securities Corp.); Lehigh Power Securities Corp. (1917); Electric Power & Light Company (1925), and United Gas Corporation (1930).
 

 [16]
 

 . For a comprehensive statement as to the method of furnishing these services, see the decision in Securities and Exchange Commission v. Electric Bond & Share Co., D.C., 18 F.Supp. 131.
 

 [17]
 

 . In any event, from March 1938, when Electric Bond and Share was held by the United States Supremo Court to be a “holding company” and thus subject to the provisions of the act, these services had to be furnished at cost and, under a ruling of the Commission, every company in the system was granted the right to terminate its contract with Ebasco when it ceased to be a subsidiary of a subholding company. See, 7 SEC 1056, 1079, and 13 SEC 203; Sec. 13(b) of the act, 15 U.S.C.A. 79M(b).
 

 [18]
 

 . For example, -with respect to United Gas Corporation, see 12 SEC 442, 14 SEC 308, 15 SEC 891, 16 SEC 80, 531, 22 SEC 420, 26 SEC 518, 32 SEC 91, 93, 378, 472; with respect to its wholly-owned subsidiary United Gas Pipe Line Company, see 12 SEC 442, 13, 777, 15 SEC 89, 26 SEC 518; with respect to Electric Power & Light Corporation, see 7 SEC 391, 881, 987; 9 SEC 917, 11 SEC 1146, 13 SEC 848, 716, 12 SEC 254, 14 SEC 167, 517, 764; 15 SEC 420, 891, 1048; 16 SEC 80, 107, 284, 429, 531, 609; 18 SEC 519, 20 SEC 786, 22 SEC 468, 23 SEC 529, 570, 674, 26 SEC 737, 29 SEC 52, 624, 30 SEC 610, 33 SEC 348; with respect to Ebasco Services, Inc., see 6 SEC 511, 1056, 7 SEC 1056, 1079, 13 SEC 203; 20 SEC 178, 700, 26 SEC 119, 8 SEC 111. 12 SEC 700; with respect to Electric Bond and Share, see 6 SEC 511, 1056, 7 SEC 124, 198, 393, 881, 987, 1056, 9 SEC 917, 978, 10 SEC 1, 411, 1206, 11 SEC 1146, 13 SEC 392, 801, 13 SEC 199, 327, 568, 716, 848, 14 SEC 910, 15 SEC 85, 293, 16 SEC 80, 107, 531, 22 SEC 866, 23 SEC 306, 529, 574, 674; 26 SEC 119, 777, 20 SEC 178, 615, 786, 29 SBC 52, 301, 675, 30 SEC 155, 32 SEC 93, 487, 655, 33 SEC 1, 21, 348, 542, 596, 674. In addition, the wholly-owned subsidiary of United Gas Corporation, United Gas PipeLine Co., formed under the laws of Delaware September 3, 1937, came under the jurisdiction of the Federal Power Commission. See, 43 PUR (NS) 74, handed down January 20, 1942, and 48 PUR (NS) 91.
 

 [19]
 

 . The Arkansas Power & Light Company, the Louisiana Power & Light Company, and the Mississippi Power & Light Company.
 

 [20]
 

 . The companies held by Gas and ByProducts Company appear to be the Natural Gas Producing Company of Louisiana, the Panola Oil & Gas Company, Excelsior Pipeline Co., Morehouse Nat. Gas Co., Inc., United States Carbon Company, and the Dallas Gas Corporation. It is not clear, but it would appear that through its control of Gas and ByProducts, Electric Power & Light Corporation acquired the Couch interests in the natural gas industry, including his holdings in the Monroe Gas Field.
 

 [21]
 

 . Gas and By-Products Company apparently held interests in these fields that Electric secured in 1926, and the Palmer Corporation with its subsidiaries owned extensive acreage in these fields. All of these interests were pooled in Louisiana Gas and Fuel Company in 1929, and Electric Power & Light Corporation is given as one of the four partners forming the syndicate controlling the new corporation by Moody in his Public Utilities for 1930. By 1938 the United Gas Corporation was the fourth partner with the other three in the syndicate.
 

 [22]
 

 . The companies in the Palmer “basket” were apparently' the Industrial Gas Company, Southern Gas & Fuel Company, Northern Louisiana Nat. Gas Company, Ouachita Natural Gas Company, and the Louisiana Gas Company. See, Moody’s Public Utilities for 1929 and 1930.
 

 [23]
 

 . Although it is not clear, apparently through this acquisition the United Gas Company gained the 20% of the capital stock of the Mississippi River Fuel Corporation it merged with the other interests when the United Gas 'Corporation was formed in 1930.
 

 [24]
 

 . The companies in the Gas and By-Products “basket” are those set out in Footnote No. 20. Those acquired through the Palmer group are set out in Footnote No. 22. Through United Gas Company the plaintiff acquired controlling interests in the following: (1) Houston Gulf Gas Company with its 11 subsidiaries or holding companies, (2) Dixie Gas Utilities Company with its G subsidiaries, (3) Dixie Gulf Gas Company, and other interests, such as the United Gas Engineering Corporation, Duval-Texas Sulphur Co., Mission Drilling Co., Greenwood Production Co., Inc., Southern States Gas Co., and 20% of the stock of the Mississippi River Fuel Corporation.
 

 [25]
 

 . Electric Bond and Share settled these suits out of court at a later date for $2,200,000, of which $750,000 represented profits Ebasco Services, Inc., had realized from “servicing” some of the sub; sidiaries of these corporations.
 

 [26]
 

 . Electric Bond and Share was compelled to take $44,000,000 in settlement of the $55,000,000 indebtedness arising out of the acquisition of the Magnolia gas interests.
 

 [27]
 

 . Under this reorganization Electric Bond and Share acquired something like 24% of the new stock of the United Gas Corporation,
 
 but was ordered,, and agreed, to divest itself of this loithin a year.
 

 [28]
 

 . Orginally tlie Duval-Sulphur Company, this interest was acquired through the United Gas Company and the intrasystem changes occurring after 1930 from this source.
 

 [29]
 

 . The leases the corporation acquired in 1949 alone covered approximately 217,000 acres.
 

 [30]
 

 . It should be noted that the entire history of the plaintiff corporation as set out in this opinion has been secured not only from the record, but also from the decisions of the Securities & Exchange Commission as set out above in Footnote No. 18, from the Public Utility Reports containing decisions of the Federal Power Commission, decisions of the federal courts as specifically mentioned in the opinion, from Moody’s Public Utility reports covering the years 1928 through 1949, and also from information furnished the court by the Secretary of State of Louisiana in connection with the year in which some of the corporations here involved secured authorization to do business in this state.
 

 [31]
 

 . Delaware, L. & W. Railway Co. v. Commonwealth of Pennsylvania, 198 U.S. 341, 25 S.Ct. 669, 49 L.Ed. 1077, and Hans Rees’ Sons v. State of North Carolina, 283 U.S. 123, 51 S.Ct. 385, 75 L.Ed. 879, both of which cases involved, actually, the taxation of income derived from
 
 tangible
 
 assets.
 

 [32]
 

 . See page No. 19 of tlie 1949 annual report of the United Gas Corporation.
 

 [33]
 

 . As stated in the McColgan case [68 Cal.App.2d 48, 156 P.2d 100], “The s'ate may include in the measure of its tax, free from constitutional objection, all income from intangibles which have a situs in this state for tax purposes. Plaintiff’s dividend income is separable from its railroad operating income to the extent that it is not subject to unitary allocation. But since plaintiff owns and holds stock in other corporations to advance the interests of its transportation business, the connection between its stock ownership and its railroad transporation is such that the stocks owned may be said to be integrally connected with that business, and, in our view, subject to taxation at the commercial domicile of that business.”